**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 722 CAP |
| | : | |
| Appellee | : | Appeal from the Order dated 1/6/2016 |
| | : | and entered on the docket on 1/12/2016 |
| | : | in the Court of Common Pleas, |
| v. | : | Clearfield County, Criminal Division at |
| | : | No. CP-17-0000062-1990. |
| | : | |
| DANIEL CRISPELL, | : | SUBMITTED:  December 6, 2017 |
| | : | |
| Appellant | : | |
| | | |
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 723 CAP |
| | : | |
| Appellant | : | Appeal from the Order dated 1/6/2016 |
| | : | and entered on the docket on 1/12/2016 |
| | : | in the Court of Common Pleas, |
| v. | : | Clearfield County, Criminal Division at |
| | : | No. CP-17-0000062-1990. |
| | : | |
| DANIEL CRISPELL, | : | SUBMITTED:  December 6, 2017 |
| | : | |
| Appellee | : | |

## OPINION

**JUSTICE WECHT**                                   **DECIDED:  September 21, 2018**

In June 1990, Daniel Crispell was convicted of first-degree murder and related offenses and sentenced to death.  Thereafter, Crispell filed a petition for relief pursuant to the Post Conviction Relief Act ("PCRA").[1]  After many years and multiple hearings, the PCRA court denied relief on Crispell's guilt phase claims, but granted Crispell a new

---

[1]     42 Pa.C.S. §§ 9541−46.

penalty phase after determining that trial counsel was ineffective for failing to investigate and present mitigating evidence. Crispell and the Commonwealth have filed cross-appeals from the PCRA court's order.

While his PCRA petition was pending before the PCRA court, Crispell sought leave from the PCRA court to amend his PCRA petition to add a claim pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), premised upon evidence disclosed by the Commonwealth during discovery. The PCRA court denied leave to amend, concluding on jurisdictional grounds that it lacked discretion to entertain the amendment. In reaching this conclusion, the PCRA court erred as a matter of law. Accordingly, we vacate the order of the PCRA court to the extent that it denied leave to amend to add the new *Brady* claim. We remand for reconsideration of Crispell's request for leave to amend to add this claim. As to all other guilt phase claims, we affirm the PCRA court's denial of relief. With respect to the Commonwealth's cross-appeal from the grant of a new penalty phase, we affirm the PCRA court's order as its findings are supported by the record and free from legal error.

## I. Background

We set forth the facts of this case in our opinion affirming the judgment of sentence. *Commonwealth v. Crispell*, 608 A.2d 18 (Pa. 1992). As we explained therein, on October 26, 1989, Crispell and his accomplice, Christopher Weatherill, kidnapped Ella M. Brown in her own car from a mall parking lot in Dubois. Crispell and Weatherill "took [Brown] to a deserted area where she was stabbed to death." *Id.* at 20. Following the murder, Crispell and Weatherill fled in Brown's car to Tucson, Arizona, where they were arrested after Crispell attempted to steal a woman's purse. At the time of the murder, Crispell was eighteen years old.

Following their apprehension in Arizona, Crispell and Weatherill were extradited to Pennsylvania. The duo was charged with murder, kidnapping, robbery, theft by unlawful taking, and conspiracy. Crispell and Weatherill were tried separately. The Commonwealth sought the death penalty for Crispell.

At Crispell's trial, the main point of contention between the prosecution and the defense was who stabbed Brown. As the prosecutor asserted to the jury in closing arguments, the answer to this question would determine whether Crispell was guilty of first-degree or second-degree murder.[2] *See* Notes of Testimony ("N.T"), 6/21/1990, at 57; Reproduced Record ("R.R.") 552a.[3] The prosecution's evidence that Crispell stabbed Brown was limited to the testimony of a jailhouse informant, Donald Skinner, whose testimony contradicted Crispell's version of events. Skinner, who shared a cell with Crispell for little more than a week, testified that Crispell had confessed that he was the one who stabbed Brown. *Crispell*, 608 A.2d at 23. Crispell testified in his defense that Weatherill devised the plan to obtain money and a car, targeted Brown, incapacitated Brown, drove away in Brown's car with Crispell following in another vehicle, and stabbed Brown to death in a secluded area. According to Crispell's testimony, Crispell and Weatherill then dragged Brown's body into the woods.

On June 22, 1990, a jury convicted Crispell of first-degree murder and the related offenses. The case proceeded to the penalty phase, which occurred on that same afternoon. The defense presentation lasted a few minutes, filling only fifteen pages of the transcript, and consisted solely of Crispell's testimony. Crispell briefly recited his age, expressed remorse, and denied being the killer. The defense submitted Crispell's

---

[2] The Commonwealth did not pursue a theory of accomplice liability against Crispell.

[3] Because both parties rely upon citations to the reproduced record to substantiate their arguments, we will likewise cite to the reproduced record where appropriate.

age and remorse as mitigating factors, as well as his sorrow for putting his parents through the aftermath of the murder. *See* 42 Pa.C.S. § 9711(e)(4), (e)(8). The Commonwealth incorporated the evidence presented in the guilt phase to establish the aggravating circumstance that Crispell committed the killing while in the perpetration of a felony. *See* 42 Pa.C.S. § 9711(d)(6). At the close of the penalty phase, the jury determined that the aggravating circumstance outweighed the mitigating circumstances. The jury unanimously recommended a sentence of death, which the trial court subsequently imposed. *Crispell*, 608 A.2d at 20.

In 1992, this Court affirmed Crispell's judgment of sentence. *Id.* at 25. On January 3, 1997, Crispell filed a timely, *pro se* petition for post conviction relief.[4] On July 20, 1999, Crispell filed an amended, counseled PCRA petition. On November 21, 2000, the Commonwealth filed an answer and moved to dismiss the PCRA petition. On February 20, 2002, Crispell filed a motion for discovery. The PCRA court, with Judge John K. Reilly presiding, heard argument on the motion on April 8, 2003. Judge Reilly granted the motion in part, denied it in part, and reserved judgment as to three discovery requests.

As part of the ensuing discovery, on August 5, 2004, the Commonwealth disclosed to Crispell an eleven-page police report, a portion of which had been withheld prior to trial. The police report was authored by Detective Deeming of the Tucson Police Department, who had apprehended Weatherill in Tucson. Detective Deeming prepared the eleven-page report detailing his discussions with, and observations of, Weatherill. Weatherill had provided a statement to Detective Deeming exculpating

---

[4]     *See Commonwealth v. Abu-Jamal*, 833 A.2d 719, 724 (Pa. 2003) ("In cases where the judgment of sentence was final prior to the 1995 enactment of the timeliness requirement, a *first* petition is considered timely if filed within one year of the effective date of the enactment"). January 3, 1997, was within one year of the effective date of the timeliness requirement.

himself of Brown's murder and blaming Crispell. Weatherill admitted that the two men kidnapped Brown and robbed her, but insisted that Crispell was the killer. In the portion of the report that was withheld from Crispell prior to trial, and as discussed below, Detective Deeming noted that he did not believe Weatherill's assertion that Crispell stabbed Brown. Because this portion of the police report had not been disclosed prior to trial, Crispell had been unaware of Detective Deeming's suspicions of Weatherill and disbelief of Weatherill's statements.

On October 23, 2006, the Commonwealth filed a supplemental motion to dismiss Crispell's PCRA petition. One year later, on October 2, 2007, Crispell moved to supplement his PCRA petition to add a claim pursuant to *Brady*,[5] premised upon the portion of Detective Deeming's police report that the Commonwealth withheld prior to trial.[6]

On December 8, 2008, Crispell filed a recusal motion requesting Judge Reilly to remove himself from presiding over the PCRA petition. Judge Reilly granted the motion, and the Administrative Office of Pennsylvania Courts appointed an out-of-county judge to preside over the PCRA proceedings. On May 22, 2009, Senior Judge Joseph Rehkamp heard argument on the Commonwealth's motion to dismiss, but issued no ruling.

---

[5] Pursuant to *Brady*, due process requires the prosecution to disclose evidence favorable to the defense. 373 U.S. at 87. "The evidence at issue must be favorable to the accused either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

[6] Technically, Crispell's supplement sought to add a new subpart to the first claim identified in the pending PCRA petition. The first claim was a general *Brady* claim, with three subparts identifying specific evidence that the Commonwealth allegedly withheld relative to three individuals: Skinner, Jennie Redline, and Michael Rebo. Crispell sought to add an additional subpart premised upon Detective Deeming's report.

Thereafter, the case was reassigned to Judge John B. Leete. The Commonwealth moved for an independent examination of Crispell's mental health. On August 5, 2010, Crispell filed a motion to have his counsel present at this examination. In an attempt to resolve the outstanding motions and to move the case forward, the PCRA court scheduled argument on all pending motions, which the court heard on September 8, 2010. By opinion and order dated January 24, 2011, the PCRA court granted Crispell's outstanding discovery requests, subject to *in camera* review. Turning to the Commonwealth's motion to dismiss, the PCRA court dismissed many of Crispell's claims as previously litigated, waived because they were not raised on direct appeal, waived for failure to plead sufficient facts, or meritless. The PCRA court identified certain claims or portions of claims that warranted further review at an evidentiary hearing, reserved judgment on three claims pending further discovery, and denied Crispell's request to have counsel present during the Commonwealth's mental health evaluation.

Turning to Crispell's outstanding motion for leave to amend the PCRA petition to add the new *Brady* claim, the PCRA court denied leave to amend, relying upon jurisdictional grounds. In particular, the PCRA court was under the misapprehension that Crispell's new *Brady* claim independently was subject to the time constraints of the PCRA,[7] notwithstanding the pending, timely PCRA petition. Based upon this flawed jurisdictional analysis, the PCRA court believed that it was constrained to deny Crispell leave to amend.

On July 7, 2011, Crispell moved to supplement the pending PCRA petition to address the deficiencies identified by the PCRA court in its January 24, 2011 opinion. On October 7, 2011, the PCRA court denied that motion in part and granted it in part.

---

[7]     *See* 42 Pa.C.S. § 9545(b).

Also on October 7, 2011, the PCRA court directed Crispell to make all final amendments to his PCRA petition within thirty days.

On August 24, 2012, the PCRA court issued an opinion and order clarifying which claims would be heard on the merits at the upcoming hearing. Over several months, from March through June 2014, the PCRA court held a seven-day hearing on the merits of eight of Crispell's claims. Much of the hearing concerned Crispell's claim of ineffective assistance of counsel during the penalty phase. Following the hearing, on January 6, 2016, the PCRA court determined that none of Crispell's guilt phase claims warranted relief. Turning to the penalty phase ineffectiveness claim, the PCRA court agreed with Crispell that trial counsel's mitigation investigation, or lack thereof, and trial counsel's performance during the penalty phase constituted the ineffective assistance of counsel and warranted the award of a new penalty phase.

Crispell and the Commonwealth have cross-appealed. This Court has jurisdiction over appeals from the grant or denial of post conviction relief in a death penalty case. 42 Pa.C.S. § 9546(d). Our standard of review mandates that we examine whether the PCRA court's rulings are supported by the record and free from legal error. *Commonwealth v. Washington*, 927 A.2d 586, 593 (Pa. 2007). Our scope of review "is limited to the findings of the PCRA court and the evidence on the record of the PCRA court's hearing, viewed in the light most favorable to the prevailing party." *Commonwealth v. Jones*, 912 A.2d 268, 293 (Pa. 2006). When the PCRA court's findings are supported by the record, we will not disturb them. *Id.*

To be eligible for relief under the PCRA, Crispell must prove by a preponderance of the evidence that his conviction or sentence resulted from one or more of the enumerated circumstances found in Section 9543(a)(2) (establishing the bases for relief). These circumstances include constitutional violations or instances of ineffective

assistance of counsel that "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(i) and (ii); *Commonwealth v. Blakeney*, 108 A.3d 739, 749 (Pa. 2014). Crispell also must demonstrate that the issues included in his PCRA petition have not been previously litigated or waived. 42 Pa.C.S. §§ 9543(a)(3), 9544(a)-(b) (defining circumstances that lead to waiver and a finding that a claim is previously litigated).

Many of Crispell's issues involve allegations of ineffective assistance of trial counsel. Counsel is presumed to be effective, and the burden rests upon Crispell to prove that counsel was ineffective. To overcome the presumption that counsel was effective, Crispell must satisfy a three-pronged test by demonstrating that: "(1) the underlying substantive claim has arguable merit; (2) counsel whose effectiveness is being challenged did not have a reasonable basis for his or her actions or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance." *Commonwealth v. Pierce*, 786 A.2d 203, 213 (Pa. 2001). "A failure to satisfy any prong of the ineffectiveness test requires rejection of the claim." *Commonwealth v. Daniels*, 104 A.3d 267, 281 (Pa. 2014).[8]

## II. Guilt Phase Claims

### A. *Brady* claim with respect to Detective Deeming's police report

Crispell raises several guilt phase issues for our review. In his first issue, Crispell relies upon *Brady* to argue that the Commonwealth violated his due process rights by

---

[8] Prior to *Commonwealth v. Grant*, 813 A.2d 726 (Pa. 2002), new counsel was required to raise claims of prior counsel's ineffectiveness at the first opportunity after new counsel entered the case. *See Commonwealth v. Hubbard*, 372 A.2d 687 (Pa. 1977). In this case, Crispell was represented at trial and on direct appeal by the same attorney. Therefore, the first opportunity to raise claims of trial counsel's ineffectiveness was during PCRA proceedings. Consequently, there are no layered ineffectiveness claims presented herein.

withholding portions of Detective Deeming's police report, which he believes contained material, exculpatory evidence about Crispell's and Weatherill's comparative degree of guilt. According to Crispell, Detective Deeming, who interviewed Weatherill in Tucson three days after the murder, stated in his report that Weatherill "shaded the story so that he appeared innocent of the actual murder itself or of any of the real wrong doing." Brief of Crispell at 64-65. Crispell asserts that Detective Deeming stated that he "strongly suspect[ed] from the demeanor and character displayed by [Weatherill] during the interview, and the way he was clearly shaded [*sic*] the evidence, that he played a much larger role in the crimes." *Id.* In this respect, Detective Deeming believed that it was possible that the murder took place exactly as Weatherill described it, except that in Weatherill's recitation, he switched places with Crispell. The Commonwealth provided only seven and one-half pages of Detective Deeming's report to trial counsel, omitting the portions pertaining to Detective Deeming's doubts about Weatherill's veracity. Crispell asserts that the Commonwealth deliberately withheld the omitted portion of the report.

On October 2, 2007, Crispell attempted to amend his pending PCRA petition to add this *Brady* claim. As noted, however, the PCRA court denied leave to amend on jurisdictional grounds. According to the PCRA court, Crispell was required to raise the new *Brady* claim within one year of his judgment of sentence becoming final or within sixty days after he discovered the *Brady* material. *See* PCRA Ct. Op., 1/20/2011, at 9−10 (citing 42 Pa.C.S. § 9545(b) (requiring a PCRA petition to be filed within one year of the date the judgment became final, unless a timeliness exception applies); *id.* § 9545(b)(1) (establishing the timeliness exceptions); *id.* § 9545(b)(2) (requiring any petition invoking a timeliness exception to be "filed within 60 days of the date the claim could have been presented")). The PCRA court faulted Crispell for waiting over sixty

days from when the Commonwealth disclosed the material to attempt to raise the new *Brady* claim. Because the Commonwealth disclosed the entirety of the police report on August 5, 2004, yet Crispell waited until October 2, 2007, to seek leave to amend to add this claim, the PCRA court held that the claim was untimely and that the court lacked jurisdiction to consider it.

Although Crispell argues the merits of this claim as if it were before this Court on appeal, it is not. The PCRA court denied leave to amend to add this claim on January 20, 2011. As leave to amend the pending PCRA petition was denied, and as the merits of the *Brady* claim have never been included within Crispell's petition, the *Brady* claim is not at issue on this appeal. The only question before us with respect to that claim is whether the PCRA court erred in denying Crispell leave to amend in order to assert it.

Recognizing this, Crispell argues in the alternative that the PCRA court committed an error of law in denying leave to amend on jurisdictional grounds. In particular, Crispell asserts that, because he had a timely PCRA petition pending before the PCRA court, leave to amend was governed by Pennsylvania Rule of Criminal Procedure 905(A)[9] rather than by the jurisdictional requirements for an untimely PCRA petition upon which the PCRA court relied. *See* 42 Pa.C.S. § 9545(b).

For its part, the Commonwealth omits any argument on the merits of the *Brady* claim and, instead, argues tepidly that the PCRA court's jurisdictional analysis was sound. In addition, the Commonwealth relies upon the PCRA court's order of October 7, 2011, directing Crispell to make any final amendments to the PCRA petition within

---

[9] Rule 905(A) provides, in relevant part, that "[t]he judge may grant leave to amend or withdraw a petition for post-conviction collateral relief at any time," and directs that "[a]mendment shall be freely allowed to achieve substantial justice." Pa.R.Crim.P. 905(A).

thirty days, as somehow rendering the October 2, 2007 motion to supplement untimely.[10]

We have little hesitation in agreeing with Crispell that the PCRA court's jurisdictional analysis was flawed as a matter of law. The PCRA court was faced with a motion to amend a pending, timely PCRA petition. Such motions are governed by Rule 905(A). They are not governed by the timeliness provisions of the PCRA. The statutory provisions upon which the PCRA court relied, *i.e.*, Section 9545(b), pertain to the initial filing of a timely PCRA petition and the requirements for establishing an exception to the general one-year filing requirement, in the event that the petition is filed outside of the one-year period. Because the PCRA court was faced with a motion to supplement a timely petition, rather than a new petition, the time restrictions of the PCRA did not apply. *See Commonwealth v. Flanagan*, 854 A.2d 489, 499 (Pa. 2004) (holding that amended petitions are not independently subject to the PCRA's time bar). The cases upon which the PCRA court relied to support its jurisdictional analysis concern the filing of untimely PCRA petitions, not leave to amend timely, pending PCRA petitions. *See Commonwealth v. Gamboa-Taylor*, 753 A.2d 780 (Pa. 2000); *Commonwealth v. Wilson*, 824 A.2d 331 (Pa. Super. 2003); *Commonwealth v. Kubis*, 808 A.2d 196, 201 (Pa. Super. 2002).

Rule 905(A) governs the amendment of a pending PCRA petition. Pursuant to this Rule, "PCRA courts are invested with discretion to permit the amendment of a pending, timely-filed post-conviction petition," which must be exercised consistently with the command of Rule 905(A) that amendment should be freely allowed to achieve substantial justice. *Flanagan*, 854 A.2d at 499-500. Adherence to this liberal standard

---

[10] We address this assertion *infra*, at page 12.

for amendment is essential because criminal defendants may have just one opportunity to pursue collateral relief in state court. *Id.*

The PCRA court in this case exercised no discretion in addressing Crispell's motion to amend. Rather, the court premised its ruling upon its mistaken belief that it lacked jurisdiction to address the claim in any event. The only option available to this Court, at this juncture, is to remand this case back to the PCRA court, so that the court may consider Crispell's motion for leave to amend in accord with the liberal standard of Rule 905(A). *See Commonwealth v. Baumhammers*, 92 A.3d 708, 730-31 (Pa. 2014) (providing that leave to amend must be sought and obtained before the new claim can become part of the proceedings). Before the PCRA court, Crispell asserted that the court should grant leave to amend because the new *Brady* claim was premised upon facts that he first learned from the Commonwealth's production of documents during PCRA discovery. According to Crispell, the Commonwealth was not prejudiced by amendment, and could not claim surprise at the addition of a claim derived from its own production of documents. Finally, Crispell asserted that permitting amendment would achieve substantial justice. On remand, the PCRA court is to evaluate these uncontested assertions pursuant to the liberal amendment standard of Rule 905(A). Of course, should the PCRA court permit amendment, it should resolve the added claim as expeditiously as is reasonably possible.

Additionally, we observe that the Commonwealth's alternative timeliness argument premised upon the PCRA court's October 7, 2011 order is perplexing. Crispell sought leave to amend to add this *Brady* claim on October 2, 2007, four years before the deadline upon which the Commonwealth now relies. In arguing that the claim would have been timely if filed by November 2011, the Commonwealth effectively concedes that Crispell's motion for leave to amend was, in fact, timely.

For the reasons stated herein, we vacate the order of the PCRA court denying Crispell's motion to supplement to add the new *Brady* claim premised upon Detective Deeming's police report, and we remand to that court for further proceedings consistent with this Opinion.

**B. Ineffective assistance of counsel for failing to produce evidence of Weatherill's lacerations**

Crispell next argues that trial counsel was ineffective for failing to produce evidence tending to corroborate Crispell's testimony that Weatherill stabbed Brown. In particular, the Tucson police officers who arrested Weatherill three days after the murder indicated in a report that Weatherill had lacerations on his arms and chest "resembling scratches of some sort." R.R. 2517a. Trial counsel possessed this Tucson report, yet made no use of it at trial. At the PCRA hearing, trial counsel testified that, although he did not recall seeing the report, if he had it in his possession he would not have introduced it because the Commonwealth would have been able to undermine its probative value by pointing out other explanations for the scratches. Trial counsel noted that, while Crispell was driving across the country, Weatherill and Crispell had been in a car accident that caused the driver's side window to shatter. After the accident, Weatherill and Crispell cleared the broken glass from the car. Trial counsel speculated that the scratches could have been caused by shards of glass. Trial counsel also agreed with the Commonwealth's suggestion that Weatherill could have sustained the scratches from sticks and branches that he may have encountered when he and Crispell dragged Brown's body through the woods.

The PCRA court found that trial counsel was aware of this evidence, but concluded, without elaboration, that counsel's failure to use it was grounded in a reasonable trial strategy. The PCRA court further opined that there was strong

evidence of Crispell's guilt, and that he would have been convicted of first-degree murder in any event.

Crispell maintains that the arguable merit of this claim is apparent in the evidentiary value this report would have had, inasmuch as the evidence could have caused the jury to infer that Weatherill was the killer. Crispell asserts that trial counsel's explanations for not using the report were unreasonable, particularly because lacerations can be probative of guilt. *See Commonwealth v. Boczkowski*, 846 A.2d 75, 81 (Pa. 2004) (including fresh scratches on the defendant's arms the night his wife was murdered in reviewing the sufficiency of the evidence). As to prejudice, Crispell notes that the only evidence that he was the killer was the testimony of Skinner, the jailhouse informant. According to Crispell, evidence of Weatherill's scratches would have corroborated Crispell's testimony, undermined Skinner's testimony, and created a reasonable probability of a different trial outcome.

We agree with Crispell that his underlying claim has arguable merit. As Crispell observes, scratches or lacerations can be probative of guilt. *Boczowski*, 846 A.2d at 81; *Commonwealth v. Elliot*, 700 A.2d 1243, 1247 (Pa. 1997) (including observations of scratch marks on the defendant in the court's sufficiency review), *overruled on other grounds, Commonwealth v. Freeman*, 827 A.2d 385, 400 (Pa. 2003). In this case, Weatherill's scratches were relevant as possible defensive wounds inflicted by the victim. *See* Pa.R.E. 402. This evidence would have corroborated Crispell's statements and testimony.

Nor was there a reasonable basis not to introduce this evidence. In a case that came down to whether the jury believed the defendant or a single Commonwealth witness, trial counsel should have presented any available evidence that might tip the

balance in favor of the defendant. It was unreasonable not to use evidence supporting a reasonable inference that, as Crispell testified, Weatherill was the killer.

Trial counsel's purported reason not to make use of this evidence was that there were other possible explanations for the scratches. True as that may be, this fact did not relieve counsel of the obligation to present available evidence to corroborate Crispell's own testimony and to undermine the testimony of the sole witness on whom the Commonwealth relied to prove that Crispell was the killer. Although it is the jury's province to evaluate the evidence in light of the Commonwealth's rebuttal, such rebuttal is no reason not to put the evidence before the jury in the first instance. The record does not support the PCRA court's conclusion that counsel acted in accord with a reasonable trial strategy.

Nevertheless, we reject this claim in light of the prejudice prong of the ineffectiveness test. To establish prejudice, Crispell is required to prove actual prejudice. This is defined as follows:

> [A] reasonable probability that, but for counsel's lapse, the result of the . . . proceeding would have been different. [*Strickland v. Washington*, 466 U.S. 668, 694 (1984)]. "In making this determination, a court hearing an ineffectiveness claim must consider the **totality of the evidence** before the judge or jury . . . . Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 695–96 [ ]. Ultimately, a reviewing court must question the reliability of the proceedings and ask whether "the result of the particular proceeding [was] unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 696 [ ].

*Commonwealth v. Lesko*, 15 A.3d 345, 383 (Pa. 2011) (emphasis in original). "A reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding." *Commonwealth v. Collins*, 957 A.2d 237, 244 (Pa. 2008). "Such a determination necessarily requires an assessment of the trial evidence as a

whole, measured along with what is proffered on collateral attack." *Commonwealth v. Daniels*, 104 A.3d 267, 285 (Pa. 2014).

Our retrospective evaluation of the trial evidence, and that evaluation's comparison to the evidence which Crispell believes trial counsel should have produced, does not resemble an exact science. We review the totality of the trial evidence produced regarding Crispell's guilt of first-degree murder. We then examine whether introduction of the evidence upon which this claim is based, subject to the Commonwealth's response and rebuttal, would have created a reasonable probability that Crispell would not have been convicted of first-degree murder.

Examining the trial evidence as a whole, Crispell is correct in his assertion that the primary factual issue in the case was the question of which man (Crispell or Weatherill) stabbed the victim. As the prosecutor observed in closing argument, the jury's "only real decision in this case is whether [Crispell] is guilty of first[-]degree or second[-]degree murder." R.R. 552a. In his opening statement to the jury, the prosecutor acknowledged that, to establish first-degree murder, the Commonwealth was required to show that Crispell killed Brown. R.R. 12a-13a. To meet this burden, the Commonwealth introduced two statements that Crispell made to police during the investigation, which were consistent with Crispell's subsequent trial testimony, and argued to the jury that Crispell's statements and testimony simply were not believable. In addition, the Commonwealth relied upon Skinner's testimony to demonstrate that Crispell was the killer. We examine this evidence in the context of the case as a whole. *See Daniels*, 104 A.3d at 285.

In his statements and his testimony, Crispell described the plan that he and Weatherill devised. That plan began when the two men were in a car that belonged to William Lamon, the father of a friend of Crispell's. Lamon had allowed Crispell to sleep

in the car. Crispell had taken the car without Lamon's consent, but found it too old to get Crispell and Weatherill to their desired destination of California. Crispell and Weatherill decided to acquire another car and some money so they could drive to California. Crispell and Weatherill decided to go to the mall in Dubois and look for a woman with a new car who would make an easy target for robbery. They decided to concoct a story about needing assistance with their car battery. According to the plan, Weatherill would knock the victim out with a pair of plyers and the two men would take the victim's car and money.

According to Crispell, he drove Lamon's car to the mall. Weatherill saw Brown there and decided that she was a viable target. Crispell stated that he asked Brown for assistance with their car battery, and Brown agreed to help them. While Crispell was attaching jumper cables, Weatherill called Crispell over to Brown's car. Crispell observed Brown sitting on the floor of her car, and Weatherill holding a knife. Crispell stated that Weatherill got into Brown's car and instructed Crispell to follow in Lamon's car. Weatherill drove away with Crispell following.

In Crispell's telling, after driving a short distance, Weatherill instructed Crispell to abandon Lamon's vehicle. Crispell complied, and drove the car into the woods. Crispell grabbed some of his belongings, and transferred them into Brown's car. Crispell had to hide from a passing car while he was removing his belongings from his vehicle. Crispell then entered the back seat of Brown's car while Weatherill drove to a remote location. According to Crispell, Weatherill instructed Crispell to go through the victim's purse, take her money, and take her engagement ring. Crispell stated that Weatherill then instructed him to get into the driver's seat. During this time, Brown remained on the floor in the front of the car, and Weatherill held onto the knife in the driver's seat. Crispell explained that it was his belief that, when he moved into the

driver's seat, Weatherill was going to restrain Brown with a belt and leave her on the side of the road. Crispell observed Weatherhill take the victim from the car along with a belt and a pair of men's shorts, which Weatherill placed over Brown's head. According to Crispell, Weatherill and Brown were about ten to fifteen feet from the car when Crispell, whose attention was on the radio, heard a scream, looked up, and observed Weatherill, covered in blood, standing over Brown's body, with the knife in his hand.

Crispell asserted that he asked Weatherhill what he was doing. Crispell testified that Weatherill responded by stating "that's one bitch that will never tell." R.R. 209a. Crispell asserted that he threatened to leave, but Weatherill stated that, if Crispell did not help Weatherill hide the body, Weatherill would blame the murder on Crispell. Crispell asserted that he was afraid of Weatherill, who still possessed the knife, and agreed to help him move the body into the woods. Crispell and Weatherill dragged the body down an embankment and through the woods.

Finally, Crispell detailed the duo's transcontinental flight, including their disposal of the knife into a river from a bridge, the car accident they were involved in while Crispell was driving, their sale of the victim's engagement ring to a pawn shop in Tennessee, Crispell's replacement of the license plate on Brown's car in New Mexico, and the attempted theft of a purse in Arizona. With respect to the attempted theft in Arizona, Crispell testified that Weatherill chose the victim and instructed Crispell to rob her.

In addition to Crispell's statements, the Commonwealth relied upon the testimony of Lamon, who lent Crispell his car to sleep in at night for a few weeks, but not to drive. Lamon's car vanished on October 25, 1989, and he reported the disappearance to the local police. Lamon also identified a sheath that was later discovered in his abandoned

car, testifying that it was the sheath for the knife which Lamon had seen Crispell carrying a week before Lamon's car disappeared.

Pennsylvania State Police Corporal John Ward testified about the police investigation into Brown's murder, as well as about the circumstances of Weatherill's and Crispell's apprehension in Arizona. Crispell was apprehended after attempting to steal the woman's purse in the parking lot of a mall, and Weatherill was apprehended in Brown's car in another mall parking lot. Corporal Ward also testified that Crispell negotiated the pawning of Brown's engagement ring in Tennessee.

When Weatherill was arrested in Tucson, he was wearing a pair of gray cowboy boots. Crispell was arrested while wearing a pair of black and white high-top sneakers. Both of these pairs of shoes belonged to Crispell, and both were tested for blood. Both pairs of shoes had blood on them that matched Brown's blood type. Each cowboy boot had several small blood stains, and one of the sneakers had one small blood stain. The Commonwealth's forensic expert testified that Brown's blood type was AB, Crispell's blood type was A, and Weatherill's blood type was B. Brown's fingernail clippings were found to have type AB blood in and under them.

The Commonwealth relied as well upon Skinner's testimony. Skinner testified that, while he shared a cell with Crispell, Crispell confessed that he stabbed Brown and revealed certain details about the crimes. According to Skinner, Crispell stated that he, Crispell, took exactly $117 from Brown's purse; that Crispell stabbed Brown on a dirt road in front of her car; that Weatherill remained in the car during the stabbing; that Crispell afterwards informed Weatherill that "this is one bitch that will never tell," R.R. 315a; that Crispell and Weatherill moved Brown's body into the woods; that Crispell and Weatherill threw the knife into a river while driving over a bridge; that Crispell and Weatherill were headed to California; and that Crispell was arrested in Tucson for

attempting to steal a purse. Skinner also testified about his own criminal past, including convictions for false reports to law enforcement authorities (for giving a fake name when questioned about underage drinking); misdemeanor theft (for stealing a live turkey); and retail theft (for stealing food from a convenience store). At the time that he shared a cell with Crispell, Skinner was incarcerated for parole violations.

Skinner testified that, in an attempt to move into a different prison cell due to fear of Crispell, he informed the prison warden about Crispell's confession. Skinner maintained that he received no promises from the warden, police investigators, or prosecutors. Skinner stated that he was testifying against his own interests, as other individuals in prison did not approve of inmates testifying against each other. The warden, to whom Skinner had reported Crispell's confession, testified that, after hearing about Crispell's confession, he transferred Skinner to a new cell in another area of the prison.

As noted, Crispell testified in his defense, consistently with his two prior statements. On cross-examination, Crispell confirmed that, on at least one occasion, he had carried the knife that was used as the murder weapon, and that he owned all of the clothes and shoes that he and Weatherill were wearing at the time of the murder and at the time they were apprehended. Crispell testified that, after the murder, he was the one who drove Brown's car across the country, pawned Brown's engagement ring, and attempted to steal the woman's purse in Arizona.

In closing arguments, the defense focused upon the relative credibility of Crispell and Skinner, recognizing that Skinner's testimony was the only evidence that was contrary to Crispell's testimony and that directly addressed who killed Brown. As trial counsel put it, the only issue for the jurors to decide was whether they believed Crispell. R.R. 543a. Trial counsel argued that all of the Commonwealth's evidence was

consistent with Crispell's testimony, which itself was consistent with his two prior statements. Trial counsel attempted to undermine Skinner's testimony by focusing upon his criminal record for theft and making false reports.

In closing arguments, the prosecutor attempted to undermine Crispell's testimony, opining that the reason Crispell's statements and testimony were consistent with the evidence was that they were truthful except with respect to the roles of Crispell and Weatherill. The prosecution stated that, in Crispell's telling of events, Crispell traded places with Weatherill. The prosecution further attempted to undermine Crispell's statements and testimony by arguing that they defied the evidence and common sense. In particular, the prosecutor countered Crispell's claim that he believed Weatherill intended only to tie up the victim, rather than to kill her, by observing that the belt that Crispell claimed to have seen Weatherill remove from the car, and upon which his belief was premised, was never found. The prosecutor emphasized that Brown had suffered defensive wounds on her hands and arms while fighting for her life against her attacker. The prosecution further questioned whether it was possible that, as Crispell claimed, Weatherill could have stabbed the victim multiple times, fighting off her defensive struggle, a mere ten to fifteen feet from the car where Crispell sat, unaware, playing with the radio. According to the prosecutor, Crispell was the leader of the two-person gang with Weatherill, as demonstrated by evidence that it was Crispell who drove Lamon's car and then Brown's car after the murder; Crispell who went through Brown's purse for money and took her ring; Crispell who pawned Brown's ring; Crispell who stole a license plate in New Mexico to disguise Brown's vehicle; and Crispell who tried to steal the woman's purse in Tucson. The prosecutor observed that, although Crispell claimed that he was horrified by the murder, he did not attempt to get away from Weatherill at any time.

The prosecutor agreed with trial counsel that the jurors' decision came down to whether they believed Crispell or Skinner. The Commonwealth argued that Skinner had no interest in the case, and no motive to lie. Further attempting to focus upon Skinner's credibility, the prosecutor detailed those aspects of Crispell's alleged confession to Skinner that Skinner could have learned only from Crispell himself.

The evidence that Crispell, and not Weatherill, killed Brown, is not overwhelming. Indeed, it comes down to Skinner's testimony alone. In finding Crispell guilty of first-degree murder, it is apparent that the jury elected to believe Skinner's testimony and to disbelieve Crispell's. Had counsel used the police report to inform the jury that Weatherill had scratches on his chest and arms three days after the murder, this evidence would not have sufficed to rebut Skinner's testimony concerning Crispell's confession nor the details of the killing that Crispell provided to Skinner.

More importantly, evidence of Weatherill's lacerations would be probative of Weatherill's comparative guilt only if there was evidence that the victim inflicted defensive wounds upon her attacker, which could have been the source of these lacerations. However, the record was devoid of any such evidence. Although the victim sustained numerous wounds when her hands and arms came into contact with the knife, there was no evidence that the victim made contact with her attacker directly. Brown's own blood type was found under her finger nails, as she was bleeding profusely from her multiple stab wounds. No other material—neither Weatherill's nor Crispell's —was found there.

Considering the trial evidence as a whole, we cannot conclude that Crispell has met his burden to show a reasonable probability that he would have been convicted of something less than first-degree murder if only the jury had considered evidence of Weatherill's scratches. The inference that Crispell would have asked the jury to draw

from Weatherill's scratches was inconsistent with and undermined by other uncontradicted evidence of record. The Sixth Amendment right to counsel exists to ensure a fair trial that produces a reliable result. *Daniels*, 104 A.3d at 285 (citing *Lockhart v. Fretwell*, 506 U.S. 364, 368–69 (1993); *Strickland v. Washington*, 466 U.S. 668, 684 (1984)). Crispell has not established that the guilt phase was rendered unreliable by counsel's failure to introduce evidence of the scratches. In reaching this conclusion, "we appreciate that the task is not to identify various hindsight 'gotcha' scenarios: *i.e.*, counsel could have done this, or he should not have done that." *Daniels*, 104 A.3d at 285. Although the question of prejudice is close, we conclude that, in the context of the entire case, the introduction of this evidence would not have offered a reasonable probability of a result other than first-degree murder. Accordingly, we affirm the PCRA court's denial of relief on this issue.

## C. Ineffective assistance of counsel for failing to exclude other-crimes evidence

Crispell next argues that trial counsel was ineffective for failing to file a motion *in limine* to preclude the Commonwealth's introduction of certain other bad acts evidence. In particular, trial counsel did not move to exclude evidence that Crispell was apprehended in Arizona after attempting to steal the purse in Tucson, nor did counsel request a cautionary instruction regarding the jury's consideration of such evidence.

Evidence of one crime is generally inadmissible against a defendant being tried for another crime. *Commonwealth v. Peterson*, 307 A.2d 264, 269 (Pa. 1973). "[W]hile generally not admissible to prove bad character or criminal propensity," evidence of crimes, wrongs, or other acts "is admissible when proffered for some other relevant purpose so long as the probative value outweighs the prejudicial effect." *Boczowski*, 846 A.2d at 88; *see also* Pa.R.E. 404(b). Permissible purposes to admit other bad acts evidence include "motive, opportunity, intent, preparation, plan, knowledge, identity,

absence of mistake, or lack of accident," subject to the court's weighing of the probative value and the potential for unfair prejudice against the defendant. Pa.R.E. 404(b)(2).

In addition, evidence of crimes, wrongs, or other bad acts "may be admissible as *res gestae* when relevant to furnish the complete story or context of events surrounding the crime." *Commonwealth v. Weiss*, 81 A.3d 767, 798 (Pa. 2013); *see also Commonwealth v. Robinson*, 864 A.2d 460, 496–97 (Pa. 2004) (holding that evidence of other bad acts is admissible where the particular crime or act was part of a chain, sequence, or natural development of events forming the history of a case); *Commonwealth v. Williams*, 896 A.2d 523, 539 (Pa. 2006) ("This Court has recognized exceptions to Rule 404, for which evidence of other crimes may be introduced, including the *res gestae* exception which allows 'the complete story' to be told.") (citing *Commonwealth v. Paddy*, 800 A.2d 294, 308 (Pa. 2002)). When the trial court admits evidence of a defendant's other bad acts, "the defendant is entitled to a jury instruction that the evidence is admissible only for a limited purpose." *Commonwealth v. Solano*, 129 A.3d 1156, 1178 (Pa. 2015).

We agree with Crispell that he has demonstrated the arguable merit of the underlying claim. Evidence of the purse snatching was a crime, wrong, or other bad act that was inadmissible against Crispell absent an applicable exception. The PCRA court herein applied the *res gestae* exception, opining without further analysis that "[t]he jury cannot be left in a vacuum as to how [Crispell] was apprehended." PCRA Ct. Op., 1/6/2016, at 6-7. This explanation might provide an arguable basis for making the jury aware of Crispell's arrest in Arizona, but it does not address or substantiate the legality of also disclosing to the jury the reason for that arrest.

Contrary to the PCRA court's holding, the purse snatching in Arizona had nothing to do with Brown's murder and, therefore, was not part of the complete story or natural

development of events forming the history of the case. At the time of the attempted purse snatching, Brown's murder was complete, having occurred days earlier and over two thousand miles away. Moreover, the PCRA court's analysis is not responsive to Crispell's assertion that trial counsel also was ineffective for failing to request a cautionary jury instruction. Had the evidence been admissible as *res gestae*, as the PCRA court held, Crispell would have been entitled to a jury instruction regarding the purpose for which the evidence was admitted. *Solano*, 129 A.2d at 1178.

Having found arguable merit to this claim, we nevertheless agree with the PCRA court that Crispell has not demonstrated that he suffered prejudice as a result of counsel's performance. PCRA Ct. Op. Jan. 6, 2016, at 7. As noted, "[o]ur prejudice analysis examines the trial evidence as a whole, measured along with what is proffered on collateral attack." *Daniels*, 104 A.3d at 285.

After the Commonwealth introduced evidence of the attempted purse snatching through the testimony of Corporal Ward, the Commonwealth played for the jury Crispell's recorded statement of February 7, 1990. As part of this statement, Crispell discussed his and Weatherill's detour to Tucson, which was compelled by their lack of money and gasoline. Statement of Crispell, 2/7/1990, at 10. They pulled off the highway to a convenience store, "planning on stealing a purse, just grabbing some lady's purse and running with it to the car." *Id.* Because of Crispell's reluctance, they were unsuccessful. Instead, they were able to solicit a few dollars from patrons of the convenience store, with which they purchased gasoline. Then, they went on their way.

According to Crispell's statement, when the two again ran low on fuel, they exited the highway and obtained directions to the two nearest malls. They traveled to one of the malls, where Weatherill stated that he would pick out a woman whose purse they could steal. They were unable to find a target. They returned to the car and drove to

the other mall.  While they were driving around the second mall, they observed "an older lady" walking across the street.  *Id.*  Crispell and Weatherill followed her, until Weatherill instructed Crispell that she would make a good target.  Weatherill told Crispell that it would be easy for Crispell to "run up and grab the purse" while Weatherill waited in the car in the parking lot.  Crispell acquiesced, followed the woman for about a block, and grabbed her purse when she tripped and fell.  As Crispell was attempting to run back to the car, bystanders interfered and obstructed his escape until police officers arrived.  In addition to this statement, Crispell discussed the attempted purse snatching in his trial testimony.

Based upon Crispell's statement and his consistent testimony, Crispell's defense at trial was to minimize his role in Brown's murder and to portray Weatherill as the leader of the two, the one who made all of the decisions.  To this end, Crispell testified that Weatherill devised the plan to target a woman who was alone in the parking lot, decided that Brown would be their target, got Brown onto the floor of her car, possessed the knife throughout the incident, directed Crispell to follow in Lamon's car and to hide Lamon's car, instructed Crispell to take Brown's money and ring, and stabbed Brown to death.  After the murder, according to Crispell, Weatherill continued to make the decisions while Crispell simply followed Weatherill's instructions.  Specifically, Crispell stated that Weatherill drove away from the murder scene to a rest stop to clean up, threw the knife into a river, and, when they arrived in Tucson, decided to steal a woman's purse.  According to Crispell, Weatherill chose the victim, talked Crispell into stealing her purse by telling him what to do and assuring him that it would be easy, and compelled him to do it.

Comparing the trial evidence as a whole, including evidence of Crispell's attempted purse snatching, to a trial record that omitted this evidence, we conclude that

Crispell was not prejudiced by trial counsel's failure to preclude admission of this evidence. Evidence that Weatherill was the leader between the two with respect to the murder was corroborated by Crispell's account of Weatherill acting as the leader with respect to the attempted purse snatching. Far from prejudicing Crispell, his recitation of the circumstances of his arrest in Tucson in his statement and his trial testimony bolstered his account of the murder of Brown. In Crispell's telling, Weatherill's influence and control began with the planning and the targeting of Brown, and ended with the planning and the targeting of the victim of the attempted purse snatching. That Weatherill compelled Crispell's participation in the murder was made more believable by Crispell's account of Weatherill compelling Crispell's participation in the purse snatching. Accordingly, because evidence of the purse snatching aided the defense, we cannot say that there is a reasonable probability that, but for counsel's lapse, the result of the proceeding would have been different. *See Lesko*, 15 A.3d at 383.

With regard to counsel's failure to request a jury instruction to limit the jury's consideration of this evidence, Crispell has not sustained his burden of demonstrating that he was prejudiced. Because evidence of the purse snatching aided the defense, we cannot say that there is a reasonable probability that, but for counsel's failure to request a limiting instruction, the result of the proceeding would have been different. *See Lesko*, 15 A.3d at 383. Accordingly, Crispell is entitled to no relief on this claim.

### D. PCRA discovery

In his PCRA petition, Crispell raised three claims related to Skinner: that the Commonwealth failed to disclose impeachment evidence pursuant to *Brady*; that trial counsel failed to impeach Skinner; and that Skinner was a government agent when he talked to Crispell in prison. At the April 8, 2003 hearing on Crispell's motion for discovery, Crispell argued that he was entitled to several categories of documents

associated with these Skinner-related claims. The PCRA court denied as too speculative most of the requests, including: (1) the prosecuting and investigative files relating to Skinner's conviction on drug charges in Jefferson County a year after Crispell's trial, which Crispell sought in order to determine whether there were any documents demonstrating an understanding between the Jefferson County District Attorney in Skinner's drug case and the Clearfield County District Attorney in Crispell's prosecution that contemplated a lighter sentence for Skinner in exchange for his testimony against Crispell; (2) information from the Pennsylvania State Police concerning any investigation of Skinner; (3) any written agreement between the Commonwealth and Skinner in the unrelated case of *Commonwealth v. Pearsall*, No. 222 - 1988 (C.C.P. Jefferson County 1988) (in which Skinner allegedly acted as a Commonwealth informant); (4) a list of all cases in which Skinner testified as a witness for the Commonwealth, cooperated with the Commonwealth, or acted as an informant for the Commonwealth; and (5) any documents reflecting whether Skinner had an expectation of leniency in sentencing on his theft convictions in Jefferson County in 1988. However, after an *in camera* review, the PCRA court granted several discovery requests related to Skinner.

The PCRA court ultimately dismissed all three claims premised upon Skinner, finding that the Commonwealth did not withhold any exculpatory evidence, that trial counsel was not ineffective, and that Skinner was not a Commonwealth agent. Presently, Crispell argues that the PCRA court abused its discretion in denying three of his discovery requests. As to Skinner's 1991 prosecution on drug charges, Crispell argues that the materials that he requested are likely to show that Skinner had a motive to cooperate with the Commonwealth against Crispell in 1990. As to Skinner acting as a government agent in any other case, Crispell asserts that he is entitled to know of all

cases where Skinner cooperated with the Commonwealth, as such evidence could have been used to impeach Skinner's trial testimony. Finally, as to Skinner's 1988 theft convictions, Crispell asserts that review of these cases could reflect Skinner's hope for leniency in exchange for his testimony against Crispell.

The Commonwealth responds that the PCRA court conducted a thorough hearing on Crispell's discovery requests, granted some of the requests for information relating to Skinner, denied other requests, and deferred consideration of others subject to *in camera* review. On March 24, 2011, the PCRA court conducted the *in camera* review and then directed the Commonwealth to turn over all documents included in that review, which included over 500 documents pertaining to Skinner. The only discovery requests that the PCRA court denied were, according to the Commonwealth, too speculative to establish good cause.

We review the denial of discovery for an abuse of discretion. *Commonwealth v. Elliott*, 80 A.3d 415, 450 (Pa. 2013). "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will as shown by the evidence or the record, discretion is abused." *Commonwealth v. Moyer*, 444 A.2d 101, 103 (Pa. 1982) (quoting *Garrett's Estate*, 6 A.2d 858, 860 (Pa. 1939)).

Pennsylvania Rule of Criminal Procedure 902(E)(2) provides that, "on the first counseled petition in a death penalty case, no discovery shall be permitted at any stage of the proceeding, except upon leave of court after a showing of good cause." Pa.R.Crim.P. 902(E)(2). "A showing of good cause requires more than just a generic demand for potentially exculpatory evidence." *Elliott*, 80 A.3d at 450 (quoting *Commonwealth v. Collins*, 957 A.2d 237, 272 (Pa. 2008)).

Evaluating Crispell's present argument in the context of the discovery requests below, it is apparent that Crispell has not demonstrated that the PCRA court abused its discretion in denying the three discovery requests pertaining to Skinner that Crispell challenges in this issue. Skinner was not charged in connection with his 1991 drug convictions until over a year after Crispell's trial, in another county. As the PCRA court stated on the record, whether there was an understanding between the prosecuting authorities in 1991 in Jefferson County and in 1990 in Clearfield County with respect to Skinner's testimony against Crispell is pure speculation. R.R. 759a ("I think your implication that somehow that Jefferson County has entered into this agreement for leniency for his testimony in Clearfield County for charges that weren't filed for a year later, I think that does take it out of the realm. I think it clearly puts it in the realm of speculation. I certainly don't think I'll grant you that."). Similarly, Crispell's request for a list of all cases that involved Skinner as a witness or informant was premised upon speculation unrelated to this case. Finally, Crispell has not demonstrated that Skinner's 1988 conviction on theft charges in Jefferson County, two years before Crispell's trial, had anything to do with Crispell's case.

Crispell has not identified any documents for which he was denied discovery that would have been exculpatory, and the PCRA court did not abuse its discretion in concluding that Crispell's claims to the contrary amount to speculation. *See Elliott*, 80 A.3d at 450 (finding that speculation that discovery may uncover exculpatory evidence is inadequate to warrant discovery under Rule 902(E)(2)); *Commonwealth v. Hanible*, 30 A.3d 426, 484 (Pa. 2011) (holding that conjecture that an opportunity to review "homicide file" might yield exculpatory evidence is inadequate to demonstrate good cause for discovery); *Commonwealth v. Carson*, 913 A.2d 220, 261 (Pa. 2006) (determining that speculation that review of requested documents will uncover

exculpatory evidence does not satisfy good cause requirement). Because the PCRA court acted within its discretion in denying the particular discovery requests, Crispell is not entitled to any relief on this issue.

### E. Cumulative Prejudice

Crispell next argues that cumulative prejudice provides an independent basis for the grant of a new trial. Crispell argues that combining the absence of evidence of the scratches on Weatherill shortly after the murder, which the jury did not hear, with evidence of Crispell's attempted purse snatching, which the jury did hear, demonstrates that Crispell was denied a fair trial.

This Court has stated that "no number of failed [ineffectiveness] claims may collectively warrant relief if they fail to do so individually." *Commonwealth v. Sepulveda*, 55 A.3d 1108, 1150 (Pa. 2012) (quoting *Commonwealth v. Rainey*, 928 A.2d 215, 245 (Pa. 2007)). However, the Court also has clarified that, if there have been multiple instances of deficient performance, "the assessment of prejudice properly may be premised upon cumulation." *Commonwealth v. Johnson*, 966 A.2d 523, 532 (Pa. 2009).

In this case, we are satisfied that there is no cumulative prejudice independently warranting relief. We resolved the claims of ineffective assistance of counsel for failing to introduce evidence of Weatherill's scratches and for failing to object to or request a cautionary instruction regarding introduction of evidence about Crispell's attempted purse snatching on prejudice grounds. These two claims are independent and distinct. They did not warrant relief individually, and did not prejudice Crispell in the aggregate. *See Commonwealth v. Spotz*, 84 A.3d 294, 321 n.22 (Pa. 2014) (rejecting a claim of cumulative prejudice because the "ineffectiveness claims at issue are independent

factually and legally, with no reasonable and logical connection warranting a conclusion that the cumulative effect was of such moment as to establish actual prejudice").

### III. Penalty Phase

We now turn to the Commonwealth's appeal from the PCRA court's grant of a new penalty phase, premised upon the PCRA court's conclusion that trial counsel was ineffective for failing to investigate and present available mitigation evidence. We review the PCRA court's decision to determine whether its findings of fact are supported by the record and whether its conclusions of law are free from legal error, viewing the evidence of record in the light most favorable to Crispell as the prevailing party in the PCRA court. *See Commonwealth v. Colavita*, 993 A.2d 874, 886 (Pa. 2010).

As with all claims of trial counsel ineffectiveness, a petitioner has the burden to prove that the underlying claim is of arguable merit, that counsel's actions lacked an objective reasonable basis, and that the petitioner was in some manner prejudiced by counsel's failure. *Commonwealth v. Busanet*, 54 A.3d 35, 45 (Pa. 2012). In a capital case, counsel has "an obligation under the Sixth Amendment to conduct a reasonably thorough investigation for mitigating evidence or to make reasonable decisions that make further investigation unnecessary." *Commonwealth v. Tharp*, 101 A.3d 736, 764 (Pa. 2014). This duty encompasses the obligation to pursue "all statutory mitigators of which [counsel] is aware or reasonably should be aware, unless there is some reasonable ground not to pursue the circumstance (such as when it might open the door to harmful evidence)." *Id.* (quoting *Commonwealth v. Malloy*, 856 A.2d 767, 787 (Pa. 2004)). Trial counsel is obliged to obtain as much information as possible to prepare an accurate history of the client. *Commonwealth v. Martin*, 5 A.3d 177, 206 (Pa. 2010).

Our consideration of counsel's penalty phase investigation and presentation includes "a number of factors, including the reasonableness of counsel's investigation, the mitigation evidence that was actually presented, and the additional or different mitigation evidence that could have been presented." *Lesko*, 15 A.3d at 380. These factors are not dispositive, however, because even if counsel's investigation and presentation is deficient, the defendant is not entitled to relief unless the defendant was prejudiced by the deficient performance. *Id.*

Accordingly, we begin by reviewing the reasonableness of trial counsel's mitigation investigation. Rather than investigating and presenting mitigation evidence about Crispell's background and mental health, trial counsel focused instead upon keeping from the jury evidence of Crispell's extensive history of violent juvenile delinquency. To this end, trial counsel made a pre-trial agreement with the Commonwealth not to put on evidence of Crispell's good character or lack of significant criminal history, which would have opened the door to evidence of Crispell's juvenile delinquency. This agreement "did not cover in any respect [Crispell's] alleged sexual abuse, extreme physical and emotional abuse as well as [Crispell's] history of mental health problems." PCRA Ct. Op., 1/6/2016, at 10.

Trial counsel discussed this agreement with Crispell, who stated that he did not want his teacher, father, brother, or any other family member to testify at the penalty phase. Crispell did not identify for trial counsel anyone that he wanted to testify on his behalf. Crispell understood that, if his family or any other witness testified about Crispell's good character, it would open the door to testimony regarding Crispell's juvenile record.

After obtaining this agreement with the Commonwealth, trial counsel prepared for the penalty phase by speaking with Crispell's former employers, neighbors, and various police officers. Trial counsel spoke briefly with Crispell's father, who contacted trial counsel's office by telephone. According to Crispell's father's PCRA testimony, trial counsel made no inquiries about Crispell's background, asking only whether Crispell's father "wanted to say anything" at the penalty proceeding. R.R. 1274a. Counsel also met with Crispell once or twice before trial.

In addition, trial counsel collected school records and non-medical military records, none of which revealed useful mitigation evidence. Trial counsel also obtained a youth forestry camp progress report prepared a year before the murder that characterized Crispell as cooperative, open, possessing good work skills, and adjusting well. Another such progress report from two months later demonstrated Crispell's positive adjustment, maturity, good work habits, and capability.

Having reviewed trial counsel's penalty phase investigation, we now examine the mitigation evidence that trial counsel presented during the penalty phase. Counsel's entire sentencing phase presentation fills only fifteen pages of transcripts, and included only a single witness. Counsel began by telling the jury that the sentencing phase would not be long, as there was not much for the jury to consider. Crispell took the stand to convey his remorse, recite his age, and deny being the killer. Counsel followed up briefly by asking the jury for a sentence of life imprisonment instead of death, acknowledging that Crispell made a mistake for which he had to pay, and asking the jury to "give [Crispell] a chance" because he "is a young boy." R.R. 685a.

The Commonwealth incorporated the guilt phase evidence into the penalty phase in order to establish the aggravating circumstance that the killing was committed while in the perpetration of a felony. *See* 42 Pa.C.S. § 9711(d)(6). The prosecutor also urged the jury to show Crispell the same sympathy that he showed towards the victim, and observed that Crispell refused to honor the trial verdict because he maintained defiantly that he was innocent of the killing. Following the penalty phase, the jury found that the sole aggravating circumstance outweighed the mitigating circumstances, and recommended a sentence of death. *Crispell*, 608 A.2d at 20.

At the PCRA hearing, Crispell presented evidence that trial counsel had failed to investigate and present to the penalty-phase jury, including evidence of physical, verbal, and sexual abuse; mental health issues, including post-traumatic stress disorder; childhood poverty and hardship; substance abuse; and suicide attempts. Crispell presented substantial evidence to support his claim that he suffered from mental health issues at the time of the murder, including the testimony of forensic psychiatrist Dr. Neil Blumberg, the results of an evaluation by psychologist Dr. Jerry Day, the result of several psychological tests conducted upon Crispell after the murder and during his incarceration for the murder, letters sent by Crispell during his pre-trial incarceration, and the testimony of an Arizona public defender. Crispell also presented several witnesses in support of his claim that trial counsel should have investigated and presented mitigation evidence pertaining to his childhood, including his father, his brother, and childhood friends Jenny Murray and Steve Demler.

In particular, Crispell presented evidence that, when he was arrested in Arizona three days after the murder, he was eighteen years old. At that time, he was

represented in Arizona by public defender Clay Hernandez, Esq. In December 1989, Attorney Hernandez had Crispell evaluated by a psychologist, Dr. Jerry Day, who administered a psychological test known as the M.M.P.I. to Crispell.[11] On January 29, 1990, Crispell was extradited to Pennsylvania. When trial counsel was appointed to represent Crispell in Pennsylvania, counsel had no experience with death penalty cases. He did not contact Dr. Day in Arizona, nor did he have Crispell examined by a mental health expert. Trial counsel did not contact any of Crispell's family members, friends, juvenile probation officers, or Attorney Hernandez in Arizona.

Attorney Hernandez testified at the PCRA hearing. According to Attorney Hernandez, he became concerned with Crispell's mental condition and mental competency upon meeting with Crispell in jail. These concerns prompted Attorney Hernandez to have Crispell evaluated by Dr. Day. Believing that "mental health issues would play heavily in any sort of capital representation [in Pennsylvania]," R.R. 1399a, Attorney Hernandez attempted to contact trial counsel in Pennsylvania in February 1990, soon after the extradition. Trial counsel never responded.

---

[11] As this Court has explained:

> The M.M.P.I. is the Minnesota Multiphasic Personality Inventory. It is a psychological assessment designed to aid in the diagnosis of personality disorders. It is comprised of questions which evaluate thoughts, emotions, attitudes, and behavioral traits. The assessment characterizes an individual's personality strengths and weaknesses, and may identify personality disturbances or neurological problems, which cause mental deficits.

*Commonwealth v. Mitchell*, 839 A.2d 202, 209 n.6 (Pa. 2003) (citing John R. Graham, *M.M.P.I.–2: Assessing Personality and Psychopathology* (3d ed. 1999)).

Soon after extradition, Attorney Hernandez received the results of the evaluation by Dr. Day. These results indicated that Crispell had impulse control problems; significant problems with depression; manic phases; posterior brain damage; and "a number of things with regard to his family and concerns that the test raised about who he is as a result of how he was raised." R.R. 1395a-1396a. Believing that the results indicated the need for further mental health investigation, Attorney Hernandez again tried to contact trial counsel, and forwarded to him Dr. Day's evaluation results. Trial counsel again failed to respond. When Attorney Hernandez later heard that Crispell had been sentenced to death, he was "at a loss" as to why trial counsel never responded to him. R.R. 1420a. He again wrote to trial counsel in October 1990, and, again, heard nothing in return.

Attorney Hernandez testified that, had counsel responded, he would have communicated his concerns about Crispell's mental health and Dr. Day's report. Attorney Hernandez characterized these concerns as including indications of depression, brain damage, family problems, and psychotic symptoms.

Dr. Neil Blumberg, a forensic psychiatrist, testified at the PCRA hearing as an expert on behalf of Crispell. Dr. Blumberg reviewed Crispell's medical records, juvenile records, military records, jail records, school records, and affidavits of Crispell's family members. Included in this review was a medical record created when Crispell was sixteen years old. At age sixteen, Crispell ran away from home. Crispell later reported that, while he was on a beach in Florida, he was brutally raped by two men. These records also reported at least one suicide attempt. Dr. Blumberg opined that the medical records should have prompted competent counsel to seek a mental health

evaluation and should have been utilized as mitigation evidence. According to Dr. Blumberg, this was a rare instance of contemporaneous documentation of childhood sexual abuse corroborating the defendant's account of what happened to him, making this report especially believable. The impact of this abuse could have been disastrous, and, according to Dr. Blumberg, raised numerous questions relevant to a mitigation investigation.

Dr. Blumberg opined that, at the time of the murder, Crispell suffered from mental health disorders including borderline personality disorder with antisocial features, bipolar disorder, post-traumatic stress disorder ("PTSD"), anxiety, depression, impulsivity, and low self-esteem. Dr. Blumberg further testified that Dr. Day's evaluation alone indicated that Crispell suffered from "a significant amount of emotional distress," hyperactivity, restless agitation, and a psychological profile consistent with individuals with bipolar disorder, schizophrenia, substance abuse, borderline personality disorder, and depression. R.R. 1564a. In addition, Dr. Blumberg observed that Dr. Day's evaluation revealed significant indications of family discord and family problems, an increased likelihood of psychosis and delusions, severe abuse, and mood problems. Dr. Blumberg determined that a follow-up evaluation would have confirmed these problems.

Dr. Blumberg explained that his diagnosis that Crispell suffered from PTSD was premised upon the rape Crispell suffered as a teenager and Crispell's childhood physical abuse. This conclusion was based upon a forensic evaluation and a standardized test for PTSD. Dr. Blumberg further testified that Crispell's juvenile records provided substantive evidence that Crispell had significant mental health

difficulties which, individually or combined with other available evidence, indicated the need for a mental health evaluation. Dr. Blumberg opined that Crispell's medical military records also indicated the need for a thorough mental health evaluation. In particular, these records revealed the military's assessment that Crispell psychologically was unfit for duty.

Crispell also introduced letters that he sent to others, including trial counsel, during his pretrial incarceration, which reflected Crispell's anxiety, his dreams about "two eyes" staring at him, and suicidal thoughts, and which were signed by Crispell and "Sharky," an alter ego that existed within, yet separate from, Crispell. R.R. 938a-941a. In one letter to trial counsel, Crispell requested psychiatric treatment as soon as possible and described his lifelong emotional problems. Crispell reiterated this request in yet another letter, seeking a mental health evaluation. Trial counsel did not recall receiving these letters. Dr. Blumberg testified that, had trial counsel consulted a mental health expert, he would have learned that the letters suggested "severe mental health issues" and warranted a mental health examination. R.R. 1536a-1542a.

Crispell also introduced evidence that Crispell's father had called trial counsel to request a psychological evaluation for his son, and that, before trial, trial counsel became aware of Crispell's extensive history of drug use. In addition, Crispell's father testified at the PCRA hearing, acknowledging that he was a strict but neglectful father who used physical violence to discipline his son; that Crispell was disrespectful and defiant as a youth, engaged in illegal behavior, and got into a lot of trouble; that he took Crispell to a physician after Crispell reported that he had been raped; and that Crispell suffered several accidental injuries as a child that led to headaches and other

symptoms. Further testimony established that Crispell's father began hitting Crispell around age three, using sticks, belts, broomsticks, and metal objects, as well as punching Crispell in the face and choking him.

Crispell's brother testified that he and Crispell grew up in poverty; that Crispell was treated harshly and subjected to corporal punishment; that Crispell was defiant; and that the brother did not believe that Crispell was raped. Finally, childhood friends Jennie Murray and Steve Demler testified on Crispell's behalf, stating that they could have testified at sentencing regarding Crispell's childhood, offering evidence of Crispell's poverty and childhood abuse.

At the PCRA hearing, trial counsel testified that he spoke with Crispell about the possibility of consulting with a mental health provider. Trial counsel explained that he and Crispell ultimately decided not to make any argument of mental health mitigation because it was assertedly inconsistent with the trial defense that Crispell was not the killer, a defense that was premised upon Crispell's credibility. Moreover, from trial counsel's personal interactions with Crispell, trial counsel observed no indication of any mental health issues and had no reason to believe that a mental health evaluation was necessary. To the contrary, prior to trial, Crispell sent trial counsel a letter indicating that he had read through the information provided by counsel and had a few questions to discuss, leaving trial counsel with the impression that Crispell was thoughtful and intelligent. Trial counsel emphasized that Crispell fully participated in trial proceedings and discussed the case with counsel. Specifically confronting Dr. Day's pretrial evaluation, trial counsel testified that the results of this evaluation indicated that Crispell was competent to stand trial and was not insane. Moreover, trial counsel did not agree

with the evidentiary value of Dr. Day's suggestion that Crispell had impulse control problems, because it was inconsistent with the defense that Crispell was not the killer.

Trial counsel further testified that the prevailing professional norms in Clearfield County in 1990 did not include the development of mental health information for mitigation purposes. Additionally, trial counsel testified that "very little was done with regard to the history of the client, family history of the client and how that affected the individual, the psychological history of the client. . . ." R.R. 1008a. Accordingly, trial counsel did not believe it was relevant to present evidence of Crispell's emotional or mental health or family dysfunction.

Trial counsel acknowledged that he did not obtain the available medical records, which would have revealed Crispell's reported rape and suicide attempts. Nor did counsel obtain Crispell's medical military records, which, as trial counsel conceded at the PCRA hearing, indicated that the military was "going to find that [Crispell] was psychologically unfit for military duty," and that Crispell suffered from emotional instability, persistent headaches, and unpredictable losses of consciousness. R.R. 1080a. According to Dr. Blumberg, the juvenile records that counsel had obtained indicated Crispell's dysfunctional family situation, providing a description of "child abuse, physical child abuse, by the father; growing up in a dysfunctional home environment; frequent moves; sexual assault; and behavioral problems; a wish to die; [and] problems with depression." R.R. 1550a.

The Commonwealth presented evidence in rebuttal, including the testimony of forensic psychiatrist Dr. Stephen Mechanick, the testimony of forensic psychologist Dr. Steven Samuel, the results of several psychological tests conducted upon Crispell

during his incarceration for the murder, and records from the Department of Corrections ("DOC") from Crispell's confinement after trial.

Dr. Mechanick testified that a review of all available information about Crispell's mental health, including a direct evaluation and a review of all DOC records, caused Dr. Mechanick to opine that Crispell did not suffer from any mental disorders at the time of the murder. Dr. Mechanick disputed that Crispell suffered from PTSD, reasoning that, because Crispell did not seek treatment for PTSD while incarcerated, he did not suffer from the disorder.

Dr. Steven Samuel, a forensic psychologist, also testified for the Commonwealth. Dr. Samuel testified that a review of all available information, including a direct evaluation and psychological testing of Crispell in prison, led him to conclude that Crispell did not suffer from any mental health disorders at the time of the murders. Dr. Samuel was critical of the manner in which Dr. Day had administered the M.M.P.I. test to Crispell, testifying that the procedure used by Dr. Day was professionally inappropriate and that Dr. Day's discussion with Attorney Hernandez about neuropsychology was beyond Dr. Day's realm of expertise.

Dr. Samuel administered the M.M.P.I.-2 to Crispell, the results of which were consistent with the results of the M.M.P.I. administered by Dr. Day two decades earlier. The results of this test showed elevated scores on indicators of emotional disturbance, mental distress, and mania. Dr. Samuel opined that Dr. Day's pretrial results indicated multiple "areas worthy of exploration" in a follow up mental health examination. R.R. 1827a, 1831a-1832a. Such areas included problems with self-control, susceptibility to dominant persons, depression, family discord, persecutory ideals, social alienation,

anxiety, substance abuse, and dissociative episodes. In Dr. Samuel's opinion, these results demonstrated the need for a full mental health evaluation and, had Dr. Samuel been asked about Dr. Day's M.M.P.I. test results at the time of trial, he would have so advised.

Further considering the results of the M.M.P.I. and M.M.P.I.-2, Dr. Samuel opined that the family discord indicator was "off the charts," and indicated the need for further exploration. R.R. 1835a; R.R. 1861a-1862a ("there are many indicators that Mr. Crispell's family engendered difficulties in him and that the nature of those difficulties should be thoroughly explored given this and the other data" about his mental health). Although Dr. Samuel did not reach a formal diagnosis of PTSD, Dr. Samuel agreed with Dr. Blumberg that Crispell "was symptomatic of PTSD," and that such symptoms could have been presented as mitigating circumstances. R.R. 1771a.

Dr. Samuel also addressed evidence that Crispell had attempted suicide several times as a teenager and once while he was awaiting trial for Brown's murder. Had Dr. Samuel learned of such behavior before trial, he would have recommended a mental health evaluation and an investigation into Crispell's history of suicide and self-destructive behavior.

Both Dr. Samuel and Dr. Mechanick testified that a capital defendant's family background and trauma would have been useful evidence for the jury to understand the defendant. Dr. Samuel agreed with Dr. Blumberg that Crispell's military records indicated the need for a thorough mental health evaluation.

Considering the evidence presented at the PCRA hearing, the PCRA court concluded that trial counsel performed "a completely inadequate and incomplete

investigation into many aspects of [Crispell's] past." PCRA Ct. Op., 1/6/2016, at 9. Regarding trial counsel's contention that he conformed to the norms of Clearfield County capital representation in 1990, the PCRA court was not persuaded, as trial counsel gave no basis for this assertion and case law demonstrated that counsel had a duty to investigate at the time of trial. *See Commonwealth v. Howard*, 719 A.2d 233 (Pa. 1988).

According to the PCRA court, "trial counsel was ineffective for failing to conduct a thorough investigation of [Crispell's] background, education, mental health, and other pertinent information, and for failing to discuss the results of such investigation with [Crispell] prior to [Crispell] making his choices as to what would and would not be presented during the sentencing phase of the case." PCRA Ct. Op., 1/6/2016, at 4. Although counsel may have had a reasonable basis to enter into the agreement with the Commonwealth to limit mitigation evidence of Crispell's character evidence, the PCRA court found that this agreement did not restrain the introduction of evidence of Crispell's sexual, physical, or emotional abuse, or his history of mental health problems. *Id.* at 10.

The PCRA court found much relevant material that trial counsel did not utilize in preparing for mitigation, including the communications from Attorney Hernandez, to whom trial counsel did not respond, and the work done by Dr. Day, with whom trial counsel had no contact. Had trial counsel responded to Attorney Hernandez, according to the PCRA court, counsel would have learned of the M.M.P.I. performed by Dr. Day that indicated several significant mental health problems. The court found that, although Dr. Samuel was critical of the way in which Dr. Day administered and scored the M.M.P.I., it was uncontroverted that Dr. Day's evaluation contained important

information about Crispell's mental health. *Id.* at 10. Moreover, although the experts who testified at the PCRA hearing offered varying opinions about Crispell's mental health, the PCRA court found that all of the experts concurred that Dr. Day's evaluation presented red flags indicating the need for further investigation and evaluation. *Id.* at 10. The PCRA court also observed that Dr. Samuel agreed with Crispell's experts that Dr. Day's test results were indicative of someone who had suffered from abuse. *Id.*

Based upon the available evidence, the PCRA court faulted trial counsel for not having Crispell evaluated by a mental health expert and for failing to attempt to secure funds for the same. *Id.* at 9. Moreover, the PCRA court found that trial counsel was unaware that Crispell allegedly had been the victim of sexual abuse, which would have been revealed in the available medical records had counsel obtained them. The PCRA court found Dr. Samuel credible in his characterization of the letters sent from Crispell to trial counsel as "a cry for help." *Id.* at 10. According to the PCRA court, trial counsel could have obtained all of this information to use as mitigation without violating his agreement with the Commonwealth. *Id.* at 11.

Acknowledging the possibility that the failure to present mitigating evidence will be considered in light of the Commonwealth's evidence of aggravation, *see Commonwealth v. Gibson*, 19 A.3d 512 (Pa. 2000); *Lesko*, 15 A.3d at 345, the PCRA court observed that, in this case, "the aggravating evidence was less than overwhelming." *Id.* at 8.

Responding to the Commonwealth's argument that Crispell himself limited the scope of trial counsel's investigation when he stated that he did not want his family to testify, the PCRA court found that this direction belies the fact that there was "a

completely inadequate and incomplete investigation into many aspects of [Crispell's] past." *Id.* at 9. According to the PCRA court, Crispell could not make an informed decision when counsel failed to present him with the results of a serious mitigation investigation. *Id.* at 11.

Although the PCRA court observed that some of the Commonwealth witnesses disputed Dr. Day's conclusions, all of the experts agreed about the psychological impacts of Crispell's upbringing and that understanding this upbringing was essential to understanding Crispell in 1990. The PCRA court rejected the Commonwealth's argument that Crispell's ineffectiveness claim was meritless because Crispell had not complained about his mental health for the past twenty years, explaining that this argument ignored the potential impact of mental health mitigation at Crispell's 1990 sentencing.

The PCRA court concluded that Crispell had demonstrated the arguable merit of his claim by presenting mitigation evidence pertaining to his mental health and background that was available but not obtained by trial counsel. The PCRA court concluded that trial counsel's proffered reasons for not investigating Crispell's mental health and background were not reasonable. Finally, the PCRA court concluded that Crispell was prejudiced by counsel's failure in this regard.

As the appellant on this issue, the Commonwealth argues that the PCRA court's findings are not supported by the record and that its reasoning misapplies governing law. First disputing the PCRA court's conclusion that the evidence in aggravation was less than overwhelming, the Commonwealth asserts that the evidentiary validity of the aggravating factor that it presented, *i.e.,* that Crispell murdered Brown during the

perpetration of a felony, is not disputed. Because it was not contested that Brown was killed when Crispell and Weatherill kidnapped and robbed her, the Commonwealth disagrees that this evidence was underwhelming.

The Commonwealth next argues that the PCRA court erred in relying upon Dr. Day's evaluation of Crispell because Dr. Day himself did not testify at the PCRA proceeding. Characterizing Dr. Day's evaluation as hearsay, the Commonwealth argues that the PCRA court was precluded from relying upon this evaluation as substantive evidence.

Turning to the arguable merit of Crispell's claim that trial counsel should have conducted an investigation into Crispell's mental health, the Commonwealth argues that this claim is premised primarily upon Dr. Day's evaluation. Attempting to cast doubt upon the validity of this evaluation, the Commonwealth argues that the evaluation itself was flawed because Dr. Day failed to administer the updated version of the test that existed at the time, administered the test in a professionally inappropriate manner, and the test was only partially completed. To the extent that Dr. Blumberg relied upon the M.M.P.I. test administered by Dr. Day in reaching his own conclusions, the Commonwealth argues that this testimony is equally suspect.

The Commonwealth also attacks the validity of Dr. Blumberg's testimony because the professional opinion that Crispell suffered from PTSD resulted from Crispell's self-report of rape. According to the Commonwealth, the expert should not have credited Crispell's uncorroborated account of the rape because, generally, a mental health practitioner should never rely solely upon a patient's self report. Had Dr. Blumberg testified at Crispell's sentencing hearing, the Commonwealth asserts that it

would have undermined this testimony by highlighting Dr. Blumberg's willingness to disregard this professional norm. The Commonwealth believes that Crispell's account of the rape is not credible for several reasons, including Crispell's varying accounts of the rape and the fact that the rape allegation surfaced only when Crispell was returned to his father by law enforcement authorities. The Commonwealth further argues that Dr. Blumberg was biased in favor of Crispell, a fact that it would have established to the jury had Dr. Blumberg testified at the time of sentencing, thereby undermining his testimony.

Further attacking the credibility of Dr. Blumberg, the Commonwealth argues that his evaluation of Crispell failed to consider the possibility that Crispell had exaggerated his symptoms. In addition, the Commonwealth argues that Dr. Blumberg's opinion that Crispell's crimes were driven by a lack of impulse control is contradicted by the record, and that the evidence Dr. Blumberg presented of Crispell's difficulties with anxiety, depression, and low self-esteem is not mitigating evidence at all. In this respect, the Commonwealth argues that mitigation evidence must be directly related to the personal culpability of the criminal defendant. *See Eddings v. Oklahoma*, 455 U.S. 104 (1982) (plurality).

The Commonwealth also argues that the PCRA court's finding that Crispell suffered from mental health disorders at the time of trial is contradicted by Crispell's lack of mental health conditions during the twenty-five years that he has been incarcerated.

The Commonwealth argues that trial counsel reasonably chose not to pursue or rely upon mental health mitigation for several valid reasons: Dr. Day already had determined that Crispell was competent to stand trial; trial counsel had no reason to suspect, from his interactions with Crispell, that there were mental health issues to

explore; the facts of the case undermined any assertion that Crispell was mentally ill; and Crispell and counsel jointly decided not to make any argument about Crispell's mental health. Relying upon trial counsel's testimony that it was outside of prevailing norms at the time and place of Crispell's trial to explore mental health mitigation, the Commonwealth also argues that trial counsel cannot be faulted for failing to anticipate that the law would develop to require a robust mental health investigation. Relatedly, the Commonwealth asserts that Crispell was being tried before a trial judge who routinely denied requests for funding for investigators and expert witnesses. In this respect, the Commonwealth relies upon trial counsel's testimony before the PCRA court that he "didn't really have any funding at all" for an investigator or expert witness. R.R. 1011a.

As to prejudice, the Commonwealth argues that, if Crispell had supplemented the penalty phase with the mental health evidence he presented to the PCRA court, the Commonwealth would successfully have undermined and rebutted it such that there is no reasonable probability that the jury would have chosen life in prison instead of a death sentence.

Addressing counsel's purported ineffectiveness for failing to investigate Crispell's childhood, the Commonwealth argues that the record contradicts the PCRA court's finding that trial counsel should have known of the possible testimony of Murray and Demler, and of Crispell's alleged rape in Florida, because Crispell never told trial counsel of Murray or Demler, or of the rape. In addition, the Commonwealth argues that because Crispell did not want to involve his family in the penalty phase, trial counsel was not ineffective for failing to use them as witnesses. Finally, the

Commonwealth argues that, had trial counsel presented evidence of Crispell's childhood, there is no reasonable probability that the jury would have chosen a sentence of life imprisonment instead of death. In this respect, the Commonwealth emphasizes that, had the jurors considered evidence of Crispell's background, they also would have had fresh in their minds the guilt phase evidence of Brown's brutal killing. The Commonwealth concludes that the omission of childhood and background evidence did not prejudice Crispell.

Crispell asserts that his claim of counsel's ineffectiveness for failing to investigate and present mitigating evidence has arguable merit as demonstrated by trial counsel's failure to pursue or develop any of the available mitigating evidence. Crispell further asserts that counsel's investigation, or lack thereof, was not the product of a reasonable strategy. Counsel's explanation for not investigating potential mitigating evidence was that he was not required to do so under the standards applicable at the time of the 1990 trial. Crispell disagrees, pointing to precedent from this Court holding that trial counsel had a duty to conduct a thorough mitigation investigation well before 1990. *See, e.g., Commonwealth v. Gorby*, 909 A.2d 775, 786, 790 (Pa. 2006); *Commonwealth v. Sneed*, 899 A.2d 1067 (Pa. 2006).

Finally, Crispell argues that he was prejudiced by trial counsel's deficient performance because the overwhelming evidence presented at the PCRA hearing demonstrated that Crispell suffered severe childhood physical, sexual, and verbal abuse; developed significant psychological and emotional problems as a result; became addicted to drugs by age thirteen; was raised in an unstable, dysfunctional, and impoverished family; and nonetheless demonstrated positive adjustment to

incarceration. Had the jury been able to consider this evidence, Crispell believes that there is a reasonable probability that at least one juror would have struck a different balance.

Upon our review of the record, the PCRA court's findings and analysis, and the parties' arguments, we conclude that the record supports the PCRA court's finding that trial counsel was ineffective for failing to investigate and present available mitigation evidence.

Regarding the arguable merit of this claim, the record supports the PCRA court's conclusion that trial counsel failed to conduct a thorough investigation of Crispell's background and mental health, and for failing to discuss his investigation with Crispell before Crispell decided what to present, or not to present, at the penalty phase. Trial counsel repeatedly ignored Attorney Hernandez's attempts to discuss Crispell's mental health. Although trial counsel received the results of Dr. Day's mental health evaluation, trial counsel did nothing with them. As the PCRA court concluded, "[i]f trial counsel had responded to [Attorney] Hernandez, he would have learned of . . . important information [about Crispell], his impulse control, depression, and other mental health issues including family concerns." PCRA Ct. Op., 1/6/2016, at 10. Had trial counsel spoken to Crispell's family members, trial counsel would have learned of Crispell's traumatic childhood and background. Counsel also had access to Crispell's juvenile records, which indicated the existence of family and mental health concerns.

This undisputed evidence supports the PCRA court's conclusion that "there was much evidence readily available that was not utilized" by trial counsel. *Id.* at 9. Had trial counsel conducted a reasonable mitigation investigation, he could have presented

extensive evidence about Crispell's abusive and traumatic childhood, and his resulting mental health problems.

Moreover, the record supports the PCRA court's conclusion that "all of the experts from both the Commonwealth and the defense who testified at the PCRA hearing concurred that Dr. Day's evaluation 'presents red flags for additional investigation and evaluation.'" *Id.* at 10. Although Dr. Day's evaluation did not provide a full picture of Crispell's mental health, it provided enough information indicating the need for further investigation and evaluation. As Dr. Samuel—the Commonwealth's own expert—testified, Dr. Day's evaluation indicated multiple areas worthy of exploration in a follow-up examination, including emotional disturbance, mental distress, mania, self-control, depression, susceptibility to dominant persons, anxiety, dissociative episodes, and family discord. Dr. Samuel testified that Dr. Day's test results were indicative of someone who had suffered abuse.

Trial counsel also could have obtained the available medical records, which would have revealed Crispell's multiple suicide attempts that, according to Dr. Samuel, would have indicated the need for a mental health evaluation. These medical records also would have revealed Crispell's report of being raped. Available military medical records would have revealed Crispell's psychological unfitness to serve. Crispell's letters to trial counsel expressed concern for his mental health and requested a mental health evaluation. Yet counsel did not investigate or arrange for a mental health examination. Had counsel obtained available juvenile records, they too would have included information about Crispell's dysfunctional family background. All of these records were available to counsel.

The United States Supreme Court has directed that all capital counsel have an obligation to investigate thoroughly and to prepare mental health and other mitigation evidence. *See Williams v. Taylor*, 529 U.S. 362, 396 (2000). Counsel cannot satisfy this obligation by relying upon "only a rudimentary knowledge of [the defendant's] history from a narrow set of sources." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003). By trial counsel's candid concession, counsel was not interested in investigating Crispell's background for mitigation purposes. Rather, counsel did not believe that evidence about Crispell's background and mental health was relevant. In conformance with what trial counsel believed to be the prevailing professional norms, he chose not to investigate Crispell's mental health or history.

Trial counsel offered a couple of explanations for this deficient performance. To the extent that trial counsel believed that his mitigation investigation was constrained by his agreement with the Commonwealth, we agree with the PCRA court that this agreement did not limit trial counsel's ability to present evidence that Crispell suffered from mental health problems and childhood abuse.

Counsel also testified that he chose not to investigate his client's background because, in counsel's words, very little was done in this respect as part of the prevailing practice at the time. This belief is consistent with trial counsel's penalty phase presentation, which consisted entirely of Crispell's own testimony. However, as the PCRA court found, trial counsel offered no basis for this belief. As this was his first capital representation, trial counsel had no direct experience in the matter. Although revealing in explaining counsel's failure to conduct a mitigation investigation, this testimony factually was incorrect. The Commonwealth's own experts, Dr. Samuel and

Dr. Mechanick, testified that a capital defendant's background and trauma were part of the mitigation assessment at the time. Professional norms for capital representation in 1990 did not exempt mental health and family background from investigation. *See Commonwealth v. Howard*, 719 A.2d 233 (Pa. 1998). To the contrary, the Supreme Court of the United States has held that counsel's mitigation investigation for a trial in 1988 was deficient where counsel failed to interview witnesses about the defendant's family background and to collect pertinent records, *Porter v. McCollum*, 558 U.S. 30, 39-40 (2009), and counsel's preparation of a social history report was standard practice at the time of a 1989 trial, *Wiggins*, 539 U.S. at 524. The High Court applied these standards to capital representation in Lehigh County, Pennsylvania in 1988. *Rompilla v. Beard*, 545 U.S. 374 (2005). The PCRA court made no error of law in concluding that the duty to investigate a client's background existed at the time of Crispell's trial.

In assessing the reasonableness of counsel's investigation, we must consider not only what evidence was known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. *Wiggins*, 539 U.S. at 527. The record supports the PCRA court's finding that available records provided ample ground for further investigation and evaluation. Information contained within communications by Attorney Hernandez, Dr. Day's test results, and Crispell's medical records would have led competent counsel to explore Crispell's mental health, history of sexual assault, and prior suicide attempts. All of the expert witnesses presented at the PCRA hearing agreed that Dr. Day's test results at the very least indicated the need for further evaluation.

Accordingly, we conclude that trial counsel's performance during the penalty phase of Crispell's trial was not based upon a reasonable strategy. Rather, it was based upon a misunderstanding of the required scope of a mitigation investigation and inattention to mitigation evidence that was readily available. *See Tharp*, 101 A.3d at 772.

We next consider whether Crispell demonstrated that he was prejudiced by counsel's omissions. "To demonstrate prejudice from trial counsel's failure to investigate and present mitigating evidence, the defendant must establish that 'it is probable that at least one juror would have accepted at least one mitigating circumstance and found that it outweighed the aggravating circumstance found.'" *Tharp*, 101 A.3d at 772 (quoting *Ligons*, 971 A.2d at 1150).

The record supports the PCRA court's finding that Crispell has demonstrated "clear prejudice." PCRA Ct. Op., 1/06/2016, at 11. There was undisputed evidence presented at the PCRA hearing that Crispell suffered from childhood physical and emotional abuse, deprivation, and poverty. All of the defense and Commonwealth witnesses agreed about the psychological impacts of Crispell's upbringing. For example, Dr. Samuel testified for the Commonwealth that child abuse teaches a child that the world is unsafe and hostile, which is psychologically debilitating for a child. Dr. Mechanick testified that childhood abuse created emotional problems and distress for Crispell, causing Crispell to become emotionally unstable. There was general agreement among the experts that Crispell's childhood abuse, family history, and substance abuse placed Crispell at increased risk for mental health problems and damaged Crispell's emotional and psychological well-being at the time of the murder.

With regard to Crispell's purported rape in Florida when he was a juvenile, Drs. Blumberg and Samuel agreed that the contemporaneous medical records corroborated Crispell's account, and both experts agreed about the psychological trauma that would have resulted from such an attack. Only Dr. Mechanick disputed the validity of this evidence. As the PCRA court held, however, it was not necessary to determine every detail about what did or did not occur, because the evidence of the sexual assault and the trauma it produced was available to trial counsel, was attested to by experts for both parties, and could have been presented to the jury.

Drs. Blumberg and Samuel likewise agreed about the significance of Crispell's suicide attempts. Dr. Mechanick, however, disputed the accuracy of the contemporaneous records and the validity of the accounts of these suicide attempts. Again, the PCRA court found it unnecessary to resolve this dispute, as the details mattered less than the evidence that there were serious mental health issues that could have and should have been brought before the jury.

Dr. Blumberg testified that, at the time of the murder, Crispell suffered from PTSD. This conclusion was based upon a forensic evaluation and a standardized test, the results of which were valid according to Dr. Samuel. Although Dr. Samuel did not diagnose Crispell with PTSD, he testified that Crispell was symptomatic of PTSD and that such symptoms could have been presented as mitigating evidence. The PCRA court appeared to credit the testimony of Drs. Blumberg and Samuel in this regard. Dr. Mechanick, however, disputed that Crispell suffered from PTSD because Crispell did not seek treatment for any PTSD symptoms while incarcerated. Although the PCRA court did not resolve these conflicting opinions by Commonwealth experts, the court

found it "very evident that there were serious mental health issues" that trial counsel should have brought before the jury. PCRA Ct. Op., 1/6/2016, at 13.

Counsel's lack of investigation and presentation of mitigation evidence left the jury without any insight into Crispell's abusive childhood or the impact this abuse had upon his character and mental health. An understanding of this background was essential to understanding Crispell. As the United States Supreme Court has held, unpresented evidence of trauma, abuse, neglect, deprivation, and mental health problems is precisely the type of evidence that is relevant to assessing a defendant's moral culpability where the sentencing jury otherwise is left without a complete understanding of the defendant's background. *See Wiggins*, 539 U.S. at 535; *Porter*, 558 U.S. at 42; *Rompilla*, 545 U.S. at 390-92; *Williams*, 529 U.S. at 396.

Comparing counsel's paltry penalty phase presentation to the significant available mitigation evidence concerning Crispell's background and mental health, we agree with the PCRA court that, had the jury been able to consider this evidence in mitigation, there is a reasonable probability that at least one juror would have struck a different balance between the mitigating and aggravating circumstances. *See Tharp*, 101 A.3d at 774 (finding prejudice where unpresented mental health evidence would have supported mitigating circumstances); *Commonwealth v. Keaton*, 45 A.3d 1050, 1092 (Pa. 2012) (finding prejudice where available evidence of family dysfunction and mental health issues was not cumulative of what the jury heard).

In reaching this conclusion, we reject the myriad arguments presented by the Commonwealth. With respect to the PCRA court's characterization of the Commonwealth's evidence of aggravating circumstances as underwhelming, the PCRA

court made this assertion only to distinguish this case from one in which the presentation of aggravating evidence overwhelmed even a substantial mitigation proffer, and was not erroneous. *See Lesko*, 15 A.3d 345 (holding that where the Commonwealth's penalty phase evidence included the defendant's conviction for two additional murders, the weight of the aggravating evidence was overwhelming).

The Commonwealth attempts to invalidate the PCRA experts' reliance upon Dr. Day's evaluation in reaching their own conclusions by asserting that evidence of Dr. Day's evaluation was hearsay and, in any event, was unreliable because of the way in which Dr. Day administered the M.M.P.I. test. However, Dr. Day's test results were not offered for their truth, *see* Pa.R.E. 801(c), but to show that counsel should have been aware of the need for further investigation and evaluation. Accordingly, this was not hearsay. Similarly, neither the PCRA court nor the experts relied upon Dr. Day's test results for their accuracy, but only as an indication that compelled further investigation.

The Commonwealth relies upon Crispell's lack of mental health treatment for the past twenty-five years to argue that this lack of evidence precludes the mental health conclusions reached by Drs. Blumberg and Samuel. In this respect, the Commonwealth relies upon the testimony of Dr. Mechanick that the absence of symptoms argues against the notion that Crispell suffered from persistent psychiatric disorders. Dr. Mechanick conceded, however, that prison evaluations indicated that Crispell suffered from sleep problems, headaches, and distress, which are symptoms of PTSD. Although the PCRA court did not resolve this discrepancy in Dr. Mechanick's testimony, it found that all of the experts testified about the psychologically damaging impact of Crispell's upbringing, and it held that this testimony collectively established a reasonable

probability that one juror may have reached a different sentencing verdict based upon the omitted evidence.

To the extent that the Commonwealth relies upon trial counsel's interactions with Crispell as a reason for trial counsel not to have investigated Crispell's background, we reiterate that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. Counsel's duty to investigate mitigation evidence was not obviated by his limited personal interactions with Crispell.

Contrary to the Commonwealth's argument that Dr. Blumberg failed to consider the possibility that Crispell exaggerated his symptoms, the PCRA court found that "all of the mental health experts who testified at the PCRA hearing agreed that there was no malingering on the part of [Crispell] during his mental health examinations." PCRA Ct. Op., 1/6/2016, at 12. Responding to the Commonwealth's argument that Dr. Blumberg should not have accepted the veracity of Crispell's self-reported rape, we observe that Dr. Samuel likewise relied upon this self-report. Moreover, Dr. Blumberg explained his basis for accepting this self report, testifying that:

> [S]o many times when there's been childhood sexual abuse, there is no corroboration. As the attorney general was saying, you only have oftentimes the defendant's statement many years later that they were abused, and there's no documentation of it.
>
> This is one of the rare occasions when we actually have some level of documentation at the time that the incident happened, shortly after that, that, you know, I think is quite relevant and very important in corroborating what Danny now says happened to him. It's entirely consistent.

R.R. 1533a. Dr. Samuel agreed. R.R. 1878a; 1925a-1926a. In contrast, Dr. Mechanick described the report as a "purported rape," and asserted that self-reported rapes are not reliable. R.R. 2031a-2036a. The PCRA court did not resolve this inconsistency. Instead, the PCRA court held that it was not necessary to resolve every detail because this evidence of sexual abuse and its impact upon Crispell was available to trial counsel, attested to by both experts, and could have been presented to the jury. We agree.

For the foregoing reasons, we conclude that the record supports the PCRA court's holding that Crispell's claim of counsel ineffectiveness for failing to investigate and present mitigating evidence during the penalty phase has arguable merit, that counsel's performance lacked a reasonable basis, and that Crispell suffered prejudice as a result of this deficient performance. Accordingly, with respect to the Commonwealth's appeal, we affirm the PCRA court's award of a new penalty phase hearing. Because we affirm the PCRA court's grant of a new penalty phase, we do not consider Crispell's challenge to the PCRA court's denial of his remaining sentencing phase claim, which is premised upon *Simmons v. South Carolina*, 512 U.S. 154 (1994).

## IV. Conclusion

Having concluded that the PCRA court's denial of Crispell's motion for leave to amend of October 2, 2007, was legally flawed, we remand to the PCRA court to exercise its discretion in resolving the motion for leave to amend in accord with Rule 905(A). As to Crispell's remaining guilt phase claims, we affirm the PCRA court's denial of relief. As to the Commonwealth's appeal, we affirm the PCRA court's grant of a new

penalty phase on the basis of trial counsel's failure to investigate and present available mitigation evidence.

Order affirmed in part, reversed in part. The case is remanded for further proceedings consistent with this decision. Jurisdiction relinquished.

Justices Baer, Todd, Donohue and Dougherty join the opinion.

Justice Mundy concurs in the result.

Chief Justice Saylor files a concurring and dissenting opinion.