J-S04042-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| TIMOTHY REICHSTINE | : | |
| | : | |
| Appellant | : | No. 205 EDA 2021 |

Appeal from the Judgment of Sentence Entered December 3, 2020
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001160-2019,
CP-51-CR-0008265-2019

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| TIMOTHY REICHSTINE | : | |
| | : | |
| Appellant | : | No. 206 EDA 2021 |

Appeal from the Judgment of Sentence Entered December 3, 2020
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001160-2019,
CP-51-CR-0008265-2019

BEFORE: BENDER, P.J.E., MURRAY, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.: **FILED FEBRUARY 14, 2022**

Appellant, Timothy Reichstine, appeals from the judgment of sentence

entered in the Court of Common Pleas of Philadelphia County following his

conviction at lower court docket number CP-51-CR-0001160-2019 ("1160-

---

* Former Justice specially assigned to the Superior Court.

2019") on one count of criminal trespass, simple assault, and criminal mischief-damage property[1] in connection with an incident occurring on November 2, 2018, at the residence of Rita Osorio ("Ms. Osorio" or "Complainant"), as well as his conviction at lower court docket number CP-51-CR-0008265-2019 ("8265-2019") on one count of burglary, criminal trespass, criminal mischief-damage property, making terroristic threats, stalking, simple assault, and contempt for violation of an order[2] in connection with an incident occurring on September 23, 2019, at the residence of Ms. Osorio. After a careful review, we affirm.

The relevant facts and procedural history are as follows: On October 8, 2020, Appellant, who was represented by counsel, proceeded to a consolidated bench trial on the charges at lower court docket numbers 1160-2019 and 8265-2019. At trial, Ms. Osorio and Police Officer Elias Rosa testified on behalf of the Commonwealth while Appellant presented no witnesses.

Specifically, Ms. Osorio testified that she and Appellant were romantically involved but that their relationship was "toxic." N.T., 10/8/20, at 10-22. On November 2, 2018, during the early morning hours, Ms. Osorio and her children were asleep in a second-story bedroom in their Philadelphia residence when Ms. Osorio heard a loud noise coming from the first floor. *Id.*

---

[1] 18 Pa.C.S.A. §§ 3503(a)(1)(ii), 2701(a), 3304(a)(5), respectively.

[2] 18 Pa.C.S.A. §§ 3502(a)(1)(i), 2902(a)(1), 3503(a)(1)(i), 3304(a)(5), 2706(a)(1), 2709.1(a)(1), 2701(a), and 23 Pa.C.S.A. § 6114(a), respectively.

at 12. Ms. Osorio quickly ran downstairs, and she observed Appellant walking into her house. *Id.* at 13. She testified he was "[i]nside my house already." *Id.* She then observed that the front door, which she had locked when she went to bed, had been kicked opened.[3] *Id.* at 12-14. Ms. Osorio confirmed Appellant did not possess, and had never possessed, keys to Ms. Osorio's residence. *Id.* at 18.

Ms. Osorio testified as follows on direct examination by the assistant district attorney ("ADA"):

Q. When you see [Appellant] in your house, what, if anything do you do?

A. I start blocking him. (Indicating). My kids were sleeping in bed. I was exhausted. I was in shock. I was tired, like physically and mentally of my stuff being damaged in my house, my privacy being invaded.

Q. So when you said "blocked," you put both hands up in front of you[?] Can you describe exactly what you mean by blocked him?

A. Yeah. I was trying to block him from—I was physically in front of him. He was in front of me. I didn't want him to come up the steps, and I was trying to, like, push him with my body to leave out the door. (Indicating).

Q. What, if anything, did he do when you did that?

A. He—we was [*sic*] kind of like, tuggling [*sic*] and then he grabbed my arm and then I snatched it away. (Indicating). And he, like, just looked at me and ended up running out, but I ended up having, like, a scratch on my arm from the tussling.

---

[3] Ms. Osorio clarified that she had an outer front door and an inner front door, which were separated by a small closed-in porch. *Id.* at 14. She noted the outer most front door was locked when she went to bed; however, the inner front door didn't "really close well anymore" because Appellant had, in a previous separate incident, "broke that door." *Id.*

*Id.* at 15.

Ms. Osorio clarified that she sustained a scratch on the back of her arm when Appellant grabbed her arm during the struggle. *Id.* at 16. Also, before Appellant ran out of the residence, he looked at Ms. Osorio and said, "I got you." *Id.*

Ms. Osorio testified that, after Appellant exited the residence, he picked up a large, carved pumpkin, which was sitting outside on the steps, and threw it into a front window. *Id.* at 17. The window shattered, and Ms. Osorio called the police as Appellant fled. *Id.* Ms. Osorio confirmed Appellant did not have permission to enter her home on November 2, 2018. *Id.* at 18.

Ms. Osorio testified she did not require medical care for the scratch to her arm; however, she received an estimate to replace the outer front door, which Appellant kicked in on November 2, 2018. *Id.* at 21-22. The estimate reflected it would cost $1,249.00 to replace the door. *Id.* at 22.

Ms. Osorio testified that, as of the date of the bench trial, she was unable to replace the front door as she was unable to afford to do so. *Id.* at 23. However, she paid a neighbor $80.00 to replace the hinges and make certain adjustments to the door, including installing hinges enabling Ms. Osorio to slide a "four by four" across the door to secure it from the inside. *Id.* at 24.

Ms. Osorio testified that, after the November 2, 2018, incident, she secured a protection from abuse ("PFA") order against Appellant on November 13, 2018, with an expiration date of November 12, 2021. Specifically, the

following relevant exchange occurred on the direct examination of Ms. Osorio

regarding the PFA order:

Q. Did you ever seek a protection order against [Appellant]?

A. Yes, I did.

Q. Do you remember when you did that?

A. It was one other time that he broke into my house. He kicked one of the doors opened. I don't—when my son's medicine was stolen, that was like—

[DEFENSE COUNSEL]: Objection.

THE COURT: Sustained. Stricken.

[ADA]: Your Honor, that was part of the prior bad acts motions that was submitted to the Court and was granted. The part of the prior bad acts motions was the PFA itself, and the reasons for which—the reasons for which Ms. Osorio sought the PFA.

[DEFENSE COUNSEL]: I agree that there was a 404B that was granted. That specific allegation, if my memory serves, is not in there. If I'm mistaken about that, I apologize. I don't remember that specific allegation in their 404B motion.

THE COURT: Okay. Give me a moment to look back. Is there anywhere that you can point me to, specifically, in your motion?

[ADA]: Your Honor, I believe that the language that the Commonwealth used was that we were asking to admit the protection from abuse order itself as well as Ms. Osorio's stated reasons for getting that protection from abuse order. And I can say that in the PFA itself, what that incident is, is one that's listed. I don't know that it, specifically, [was] enumerated in the motion.

The language on page 5, in Number 2, the Commonwealth seeks to introduce testimony about the existence of this PFA, and why the complainant filed for the PFA.

THE COURT: I see in my notes that I was allowing for the basis for the PFA as well as the existence of the PFA. So I am going to overrule your objection based on my prior ruling.

[ADA]: Thank you.

*Id.* at 25-26.

Ms. Osorio explained she requested the PFA order against Appellant because Appellant had stolen her son's medicine and then broke into her residence on November 2, 2018. *Id.* at 29-30. She had previously asked him to stay away, and since he wouldn't, she sought the PFA order. *Id.* She confirmed she served the PFA order on Appellant. *Id.* at 28. Specifically, she observed a "lady officer" serve it on Appellant at a Wawa. *Id.*

However, Ms. Osorio testified that, sometime thereafter, she and Appellant started seeing each other again, but "[i]t wasn't a constant [relationship]." *Id.* at 31. Rather, they would meet occasionally with Appellant making promises to pay for the door; however, "too much [was] involved[,] so then [she] just stopped talking to him." *Id.* Ms. Osorio testified she blocked Appellant on Facebook, she did not answer his phone calls, and once again, they were no longer dating. *Id.* at 32.

However, on September 22, 2019, Appellant came to Ms. Osorio's house with a cell phone. *Id.* Ms. Osorio testified on direct examination that the following occurred at her house during the afternoon of September 22, 2019:

> Q. Can you tell us what happened on September 22nd of 2019 that brings you to court?
>
> A. On September of that date, [Appellant] came over during the day to bring a phone, so he can have communication since I stopped all communication. I blocked him on Facebook. I didn't fall for different names and the different profiles.
>
> ***
>
> Q. And what happened when he brought you a phone?
>
> A. I told him I didn't want it. I don't want nothing [*sic*] from him, and I don't want to be crumbed and pennied [*sic*], and I didn't

want to—the little crumbs so that you can—the magnet thing. I just didn't want nothing [*sic*] to do with him. I told him we'll take care of it at court.

Q. What do you mean by "the magnet thing"?

A. Like, he make [*sic*] it sound—oh, I'll give you the money for your door because I know you and the kids deserve to be safe. You know, I F'd that up. Like, you know, Imma [*sic*] pay you for it. And then he don't [*sic*] even give you enough to get the door.

Q. Understood. So did he, physically, come to your house to bring you the phone?

A. Yes.

Q. Do you remember what time it was that day?

A. I would say like 3 o'clock; 3:30 [p.m.].

*Id.* at 32-33.

Ms. Osorio indicated she made it clear to Appellant that she did not want the cell phone. *Id.* at 33. Appellant told her that "he was going to come back," and Ms. Osorio told Appellant that, if he returned, she was going to call the police. *Id.* at 34. Appellant then left. *Id.*

Ms. Osorio testified the following occurred thereafter during the early morning hours of September 23, 2019:

Q. What, if anything, happened after that?

A. He left. He left. And then he ended up coming back in the morning [on September 23, 2019]. Like 1 o'clock in the morning. 2 o'clock in the morning.

Q. And what happened when he returned?

A. My cousin said she was coming over. She works security. She text[ed] me and she said she was coming over, and I said okay. So I didn't put the four by four to secure the door. It just had the little—the little round knob that you can push in and out. Like, a little knob. No deadbolt worked anymore.

- 7 -

So I didn't four by four the door. I thought my cousin was coming over. Instead, he pushed the door through—[Appellant] pushed the door through.

Q. So let's—if we can just get exactly what you heard and saw. So you didn't put the four by four on the first door. And then where did you go? Where were you?

A. I was upstairs, but when I heard the door, like, come unlatched, like opened, I thought my cousin was coming—like, she was coming through. Instead, it was [Appellant].

Q. How did you discover it was him?

A. Because I saw him. I ran down the steps.

Q. Where did you see him when you ran down the steps?

A. Right inside the house—in the front porch, after [the] front door.

Q. After the front door. So after the first front door?

A. Yeah.

*Id.* at 34-35.

Ms. Osorio testified Appellant then walked in through the inside front door, and she said to him, "[Y]o, what are you doing? I told you I didn't want you here. Like, I don't want your phone. I don't want nothing [*sic*] to do with you." *Id.* at 36. Ms. Osorio testified she had mace, a taser, and a cell phone[4] hidden in her upstairs bedroom, so she ran upstairs to retrieve something to defend herself. *Id.* at 36-37. Appellant followed her upstairs. *Id.* at 37.

Ms. Osorio testified she laid across the mattress of her bed and reached for the mace when Appellant jumped on her back. Specifically, she testified as follows on direct examination:

---

[4] Ms. Osorio clarified the cell phone was broken but could still be used to call 911. *Id.* at 37.

Q. So just to make sure I'm understanding, you're reaching for the mace, and were you on your stomach on the mattress?

A. Yeah.

Q. Was anyone else in the room with you?

A. Him, on top of me.

Q. Was anybody else home besides you and—

A. My two kids in the front room.

Q.—when you were laying on your stomach, describe to us how [Appellant] was on top of you?

A. He was laying on top of me. Like, his stomach was on my back.

Q. Was he saying anything at that time?

A. Then he said, You gonna give me [your] pussy.

*Id.* at 37-38.

Ms. Osorio testified she told Appellant she didn't want to "deal with" him and didn't want to "be with" him because he was "all aggressive and all dirty and high." *Id.* at 38. Ms. Osorio indicated she tried to push Appellant off of her, and Appellant said, "[S]o you not gonna to [*sic*] take care of me?" *Id.* at 39. Ms. Osorio testified on direct examination the following then occurred:

A.      And then he stand [*sic*] up, and he grabbed me and just—I just fell, like…I don't know if we fell together from me struggling or he pushed me. But I know I ended up on the floor, and I was trying to hold onto the mattress, you know, like, to keep me from getting attacked. I tried to hold on to the mattress and I can't— like all the sheets, the pillow—everything came down with me. I ended up on my back.

        And then he looked at me and he said, You gonna take care of me, or I'm going to do something.

        I said, Well, you gonna have to do what you're gonna to [*sic*] do, then, because I'm not doing nothing [*sic*] for you. He punched me in my face right here. (Indicating). I had a big bump.

[ADA]: For the record, when the complainant is saying "right here," she's pointing to the left side of her forehead on her hairline.

Q. When you said he punched you, where were you when that happened?

A. On the floor on my back.

Q. Where was he?

A. Right over me on this side. (Indicating).

Q. On the right side?

A. Yeah. I was like this on my back, and he was right here like this. (Indicating).

\*\*\*

Q. Was he sitting? Standing? Something else?

A. No, he was standing and his right fist, boom, right here. (Indicating).

Q. Do you remember how many times his right fist made contact with your left forehead?

A. Two on my forehead.

Q. Was he saying anything while that happened?

A. No. I was getting the repercussions for not taking care of him.

Q. After he hit you twice with his right fist, what, if anything, happened after that?

A. He kicked me.  He stomped me on my face right on my lip.  I had a cut, like, really bad inside of my mouth and all this got bruised.

Q. I know this is going to sound like a really silly question, but when you say he "stomped you," can you describe exactly the physical action he took?

A. He's standing up, and he, literally, took his foot and stomped me, like, hit me or like, kicked me. (Indicating).

\*\*\*

Q. And do you remember how many times he stomped you on the face?

A. He stomped me once in the face and then he went to stomp me again, but I put my foot up to block him and my foot got injured.

- 10 -

Q. Can you describe to us how your foot got injured?

A. My toe got, like, the bone broke in the toe, over the toe knuckle. It got really swollen. It was bad.

Q. What, if anything, did you do after that? After you said you put your foot up?

A. I started screaming. I started screaming.

\*\*\*

Q. After you put your foot up to block him, what did you do?

A. I started screaming really loud. He ended [*sic*] into shock and he ran out.

Q. Okay. Before he ran out, did he say anything else to you?

A. No. –I

Q. And when he ran out, where were you?

A. Still on the floor.

*Id.* at 39-42.

Ms. Osorio testified she immediately called 911, and she checked on her children. *Id.* at 42. She testified the ambulance came, but since she had children and could not leave them, she did not go to the hospital in the ambulance. *Id.* at 45. However, she went to the emergency room shortly thereafter with her two children in tow. *Id.* at 45-46.

Ms. Osorio testified she sustained "black and blue" eyes and lips, as well as "a really bad cut inside" of her mouth because of Appellant's assault. *Id.* at 47. She indicated the bruising around her eyes lasted for approximately two weeks, and the bruising around her lips lasted "[a] little longer." *Id.* at 51. She also suffered pain in her toe for approximately eight weeks. *Id.* at 46.

Ms. Osorio confirmed Appellant did not have permission to enter her home on either September 22 or 23, 2019, and he did not have a key to her home. *Id.* at 53. She also confirmed Appellant did not have her consent to engage in any sexual activity at this time. *Id.*

On cross-examination, Ms. Osorio confirmed she and Appellant had "an on-and-off relationship." *Id.* at 56. However, she indicated the November 2, 2018, incident occurred at a time when they were "broke[n] up." *Id.* Ms. Osorio noted that, if they were not broken up at this time, it would have been unnecessary for Appellant to kick in her door to gain entry. *Id.*

She confirmed she suffered a scratch to her arm on November 2, 2018, during the "tuggle," and her arm hurt. *Id.* at 59. Ms. Osorio confirmed Appellant smashed her window by throwing a large, carved pumpkin at it as he was leaving her home on November 2, 2018. *Id.* at 60. She acknowledged that Appellant later apologized for his actions, and he paid to have the window replaced. *Id.* at 60-61.

Ms. Osorio indicated she made a statement to the police regarding the November 2, 2018, incident. She admitted there is no indication in the statement that she told the police about Appellant throwing the pumpkin. *Id.* at 82-83.

Ms. Osorio testified on cross-examination that, after the November 2, 2018, incident, Appellant kept trying to induce her into a relationship; however, she did not seek out a relationship with Appellant. *Id.* Ms. Osorio

acknowledged she received a PFA order against Appellant on November 13, 2018; however, she continued to meet with him "outside." *Id.* at 62. She admitted she visited him while he was in prison on March 1, 2019. *Id.* at 84. She initially denied visiting Appellant a second time, on March 27, 2019, while he was in prison; however, when confronted with the inmate visitor log, she admitted she visited him on March 27, 2019, as well. *Id.* at 84-85.

Ms. Osorio testified on cross-examination that, as of September of 2019, she and Appellant were no longer in a relationship, and any relationship they had ended a "[f]ew months before that." *Id.* at 56. Ms. Osorio admitted the September 23, 2019, incident "happened pretty fast[.]" *Id.* at 64. She indicated Appellant gained entry into her home by pushing the door open even though it was locked. *Id.* at 67, 69-70. She admitted the door was not secured at that time with the four by four; however, she noted that "he wasn't allowed to come over" that night. *Id.* at 68.

Ms. Osorio testified on cross-examination that "[Appellant] didn't knock" on the door on September 23, 2019, and she "didn't open the door for him." *Id.* at 70. However, when confronted with her police statement, she admitted the statement indicates she told the police "[w]hen he got to the house, he started banging on the door." *Id.* at 90. She also admitted the police statement indicated that she told the police "[m]y door wasn't locked because I was waiting for my cousin." *Id.* at 91. However, she also noted the police

statement indicates she told the police Appellant "just walked in. I told him that he can't come in my house, and I don't want to be with him." *Id.*

Defense counsel confronted Ms. Osorio with her preliminary hearing testimony from November 14, 2019. Therein, Ms. Osorio testified that, at 3:00 a.m. on September 23, 2019, she heard a knock, opened the door, Appellant came in, and she told him to leave. *Id.* at 92. However, when confronted with this preliminary hearing testimony on cross-examination at trial, Ms. Osorio indicated, "I didn't open the door." *Id.* at 93.

Ms. Osorio admitted that, on September 23, 2019, Appellant did not have "a gun or knife" with him; however, she noted that "[h]is hands are weapons" when he uses them. *Id.* at 72. She indicated that, after she jumped on her bed to reach for the mace, Appellant immediately jumped on her, making a sexual demand. *Id.* at 73.

She noted she refused him because he was "disgusting…abusive…high and dirty." *Id.* at 75. She then tried to get him off her back, and "[h]e beat [her]." *Id.* at 74. She testified Appellant injured her toe when she was "like, in a turtle shell on the floor from getting stomped the second time, trying to block [her] face." *Id.* at 75.

Defense counsel again confronted Ms. Osorio with her police statement regarding the September 23, 2019, incident. The police statement indicates that Ms. Osorio reported:

Then I ran upstairs to the back bedroom. I went to grab the mace that I had beside the bed. Then he grabbed me, and we started wrestling on the bed and he threw me on the floor.

He punched me twice in the face and once in the head and then he tried to kick me in the face and he got me in the lip. He was trying to step on me.

I started screaming, and he kind of went in shock and ran out of [the] house. After he left, I called 911[.]

*Id.* at 96.

Ms. Osorio admitted the police statement contains no mention that she injured her toe during the struggle. *Id.* at 96-97. However, she noted her police statement indicates she sustained swelling to her "foot," and while she may not have been specific in her statement to the police, the "foot" includes "the toe." *Id.* at 97. Ms. Osorio admitted the hospital did not diagnose her with a broken toe; but rather, she was diagnosed with an abrasion to her toe. *Id.* at 98.

On cross-examination, the following relevant exchange occurred between defense counsel and Ms. Osorio:

Q. –at the end of this [September 23, 2019, incident], would you agree with the assessment that you were banged up but okay. Would that be a fair assessment?

A. Hell, no.

Q. Hell, no. Now—

A. I was ashamed. I was confused. I was in shock. I felt violated in my house. I can't be safe. No privacy. Someone's taking your will all the time. Violating you, taking your stuff, coming to your house when you don't ask them to, breaking your stuff, hitting you.

Then the bruises stay for a long time. They linger and people see it. It's more than just an incident. It lingers around afterwards[.]

And you should be able to say no, I don't want to be bothered. I don't want to be abused. You should fix people's stuff after you do certain things to them, too.

*Id.* at 76.

Ms. Osorio admitted Appellant did not attempt to remove her clothes or his own clothes during the September 23, 2019, incident; however, she noted "[h]e was too busy punching me[.]" *Id.* at 77. She also acknowledged Appellant did not try to force open her legs or force her to engage in oral sex; however, she indicated "[h]e was trying to beat it out of me so I could, you know, respond. So I can be submissitive [*sic*]." *Id.* Ms. Osorio testified that, from her point of view, Appellant beat her as punishment because she wouldn't have sex with him. *Id.* at 78. She acknowledged that, when she began screaming, Appellant ran off, at which point she called 911. *Id.* at 78-79.

On redirect examination, Ms. Osorio testified that, on September 23, 2019, before Appellant broke in, the outside front door was locked. *Id.* at 103. In this regard, she admitted it was neither bolted nor secured with the four by four across it; however, the little lock on the doorknob was turned to the locked position. *Id.* She indicated the inner front door was closed but not locked. *Id.* at 104. As to whether Appellant knocked prior to entering on

- 16 -

September 23, 2019, Ms. Osorio admitted, "I don't remember, to be—really, I can't remember." *Id.* at 108.

Police Officer Elias Rosa testified he was on duty on November 2, 2018, at 1:45 a.m., when he responded to Ms. Osorio's home. *Id.* at 112-13. He testified Ms. Osorio reported that, a few weeks prior to the incident, she ended her relationship with her paramour, Appellant, over his drug abuse, and he then came to the house on November 2, 2018, and kicked in her door. *Id.* at 112. Officer Rosa advised her to get a PFA order. *Id.*

Officer Rosa testified he responded to Ms. Osorio's home on September 23, 2019, at approximately 3:00 a.m. *Id.* at 117. He indicated Ms. Osorio reported the following: "[Appellant] kicked the door in and forced himself upon her. They struggled and he, then, fled again upon our arrival. He wasn't on location anymore. At this time, she did have an active PFA." *Id.*

On cross-examination, Officer Rosa testified Ms. Osorio reported that, after the September 23, 2019, incident, she was "banged up, but okay." *Id.* at 123. Regarding the November 2, 2018, incident, Officer Rosa indicated he could not recall whether he asked Ms. Osorio how the window was smashed. *Id.* at 124. However, he admitted a body camera worn by his partner revealed that Ms. Osorio reported she did not know how Appellant broke the window on November 2, 2018. *Id.* at 125.

At the conclusion of the testimony, the trial court found Appellant guilty of the charges at each lower court docket number as indicated *supra*. On

December 3, 2020, Appellant was sentenced to an aggregate of two years to four years in prison, to be followed by two years to four years of probation. Appellant filed a separate timely, counseled notice of appeal at each lower court docket number in compliance with **Commonwealth v. Walker**, 646 Pa. 456, 185 A.3d 969 (2018), and this Court consolidated the appeals. The trial court directed Appellant to file a Pa.R.A.P. 1925(b) statement, Appellant filed a counseled statement, and the trial court filed a responsive Rule 1925(a) opinion on April 30, 2021.

On appeal, Appellant sets forth the following issues in his "Statement of the Questions Involved" (verbatim):

A. Was the evidence of burglary insufficient where the complainant gave completely contradictory testimony, testifying at one point that Mr. Reichstine broke into her house and at another time testifying that he knocked on her door and she let him in?

B. Was it an abuse of discretion and an error of law for the trial court to admit other acts evidence that was in no way similar to the act for which Mr. Reichstine was being tried?

Appellant's Brief at 5.

In his first issue, Appellant avers the evidence was insufficient to sustain his conviction for burglary as it related to the September 23, 2019, incident. He specifically avers the Commonwealth failed to prove he entered Ms. Osorio's home without her permission and/or he entered with a specific intent to commit a crime therein. **See id.** at 22-23.

- 18 -

In this regard, he avers the Complainant's testimony was "contradictory and incompatible," as well as impeached on cross-examination, thus rendering it unworthy of belief. *Id.* at 15. His argument focuses solely upon the credibility of the testimony presented by the Commonwealth and suggests the testimony of Ms. Osorio consisted of "diametrically opposed sets of testimony" such that "the trial court was left to speculate as to which version was true." *Id.* He concludes that, under such circumstances, the evidence was legally insufficient to support his conviction for burglary, and in support of his argument, he relies upon our Supreme Court's decision in *Commonwealth v. Karkaria*, 533 Pa. 412, 625 A.2d 1167 (1993).

Initially, in reviewing Appellant's sufficiency claim, we are mindful of the following well established legal precepts:

This Court's standard of review when considering a challenge to the sufficiency of the evidence requires us to look at the evidence in a light most favorable to the verdict winner and determine whether the evidence presented, actual and/or circumstantial, was sufficient to enable a fact-finder to find every element of the crime charged, beyond a reasonable doubt. *See Commonwealth v. O'Brien*, 939 A.2d 912 (Pa.Super. 2007).

> In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and the circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.

- 19 -

*Id.* at 913–914 (quotation omitted). The finder of fact is free to believe all, some, or none of the evidence presented and is free to determine the credibility of the witnesses. ***Commonwealth v. Dailey***, 828 A.2d 356 (Pa.Super. 2003).

Here, Appellant was convicted of burglary under 18 Pa.C.S.A. § 3502(a)(1)(i), which provides the following:

> **(a) Offense defined.--**A person commits the offense of burglary if, with the intent to commit a crime therein, the person:
>
> (1)(i) enters a building or occupied structure, or separately secured or occupied portion thereof, that is adapted for overnight accommodations in which at the time of the offense any person is present and the person commits, attempts or threatens to commit a bodily injury crime therein[.]

18 Pa.C.S.A. § 3502(a)(1)(i) (bold in original).

The intent to commit a crime must be contemporaneous with entering the dwelling, and we determine intent by the totality of the surrounding circumstances. ***See Commonwealth v. Magnum***, 654 A.2d 1146, 1147 (Pa.Super. 1995). However, the Commonwealth has no burden to identify the specific crime to be committed.[5] ***Commonwealth v. Alston***, 539 Pa. 202, 651 A.2d 1092, 1094 (1994).

---

[5] "When the Commonwealth does specify, in the information or indictment, the crime defendant intended to commit, the Commonwealth must prove the requisite intent for that particular crime in order to prove a burglary or attempted burglary." ***Commonwealth v. Brown***, 886 A.2d 256, 260 (Pa.Super. 2005). In the case *sub judice*, a review of Appellant's criminal
*(Footnote Continued Next Page)*

> While this intent may be inferred from actions as well as words, the actions must bear a reasonable relation to the commission of a crime. Once one has entered a private residence by criminal means, we can infer that the person intended a criminal purpose based upon the totality of the circumstances.

*Commonwealth v. Lambert*, 795 A.2d 1010, 1022 (Pa.Super. 2002) (*en banc*) (citations omitted). Knowingly violating a PFA order may satisfy the criminal intent required under the burglary statute. *Commonwealth v. Majeed*, 548 Pa. 48, 694 A.2d 336, 338-39 (1997).

Moreover, it is a defense to a prosecution for burglary if any of the following exists at the time of the commission of the offense: "The actor is licensed or privileged to enter." 18 Pa.C.S.A. § 3502(b)(3).

Here, the trial court, sitting as the finder of fact, made the necessary factual findings, and based thereon, the trial court concluded the evidence was sufficient to sustain Appellant's conviction for burglary at lower court docket number 8265-2019 in connection with the September 23, 2019, incident. Specifically, the trial court indicated the following:

> At about 3:00 p.m. on September 22, 2019, [Appellant] went to Complainant's home to give her a cell phone. Complainant testified that [Appellant] had previously broken her cell phone and did not have any way to contact her, as she had blocked him on social media. After Complainant told [Appellant] she did not want anything from him, he told her he was going to come back. She told him that she would call the police if he returned, and he left. [Appellant] returned in the early morning

---

information for docket number 8265-2019 reveals the Commonwealth did not specify which particular crime Appellant intended to commit during the burglary as forth in 18 Pa.C.S.A. § 3502(a)(1)(i). *See* Information, 11/20/19, at 1.

- 21 -

hours of September 23, 2019. Complainant heard someone enter and went downstairs. When she saw [Appellant] in her home, she told him to leave then ran upstairs to get the mace she had hidden under [her] bed. [Appellant] followed Complainant upstairs, wrestled with her on the bed and floor, and demanded that she have sex with him. When Complainant refused, [Appellant] punched and kicked her in the face. Complainant lifted her foot to block [Appellant's] kicks and began to scream, at which point [Appellant] ran out of the house and Complainant called the police. This is the basis of [the burglary charge] at docket number [8265-2019].

\*\*\*

Here, Complainant testified in detail about multiple interactions between her and [Appellant]. Specifically, Complainant testified that she had an active Protection from Abuse Order ("PFA") against [Appellant] at the time of the September 2019 incident and that she saw [Appellant] being served with the PFA. This testimony was supported by the dated PFA with an attached signed Affidavit of Service. She also testified that [Appellant] entered her home, ignored her when she told him to leave, followed her upstairs, and became physically violent by punching and kicking her. This testimony was supported by her prior statements to police and photographs of Complainant and her home.

\*\*\*

The circumstances of [Appellant's] repeated contact with Complainant are evidence of [Appellant's] intent to commit simple assault at the time of entry. Complainant testified about multiple instances in which [Appellant] entered her home without invitation and physically injured her, leading her to obtain a PFA [order] against him….The history of [Appellant's] relationship with Complainant and [the] pattern of [Appellant's] behavior towards her support a finding of [Appellant's] intent to commit simple assault at the time of entry.

The intent element was also proven by evidence that [Appellant] intended to violate an active PFA [order] at the time of entry. Complainant obtained a temporary PFA against [Appellant] on November 6, 2018, and it was served upon him on November 11, 2018. The temporary order was made final on November 13, 2018. This PFA [order] remains effective until November 12, 2021, prohibits [Appellant] from having any contact with Complainant[,] and excludes him from her home. In

light of that order, [Appellant] intended to commit a crime in the home if he intended to enter it or have contact with Complainant. Such intent was clearly proven by Complainant's testimony that [Appellant] repeatedly forced his way into her home to give her a cell phone and have sex with her, first going to her home at about 3:00 p.m. on September 22, 2019, and again at about 1:00 a.m. on September 23, 2019.

[Thus,] the intent element required for [the] conviction of burglary was satisfied by proof of intent to both violate an active PFA and commit simple assault upon entry.

Trial Court Opinion, filed 4/30/21, at 1-2, 4-5, 6-7 (citations to record omitted).

Accordingly, based on the aforementioned, the trial court found no merit to Appellant's claim that the Commonwealth failed to prove Appellant entered Ms. Osorio's home without her permission and without the specific intent to commit a crime therein. However, this does not end our inquiry, as Appellant contends the trial court's factual findings and sufficiency conclusions are based on speculation since Ms. Osorio's testimony was "riddled with critical inconsistencies" such that it was unreliable. Appellant's Brief at 21.

It is well settled that "[a]n argument regarding the credibility of a witness'[ ] testimony goes to the weight of the evidence, not the sufficiency of the evidence." *Commonwealth v. Melvin*, 103 A.3d 1, 43 (Pa.Super. 2014). However, in *Karkaria*, *supra*, upon which Appellant relies, our Supreme Court stated that in certain circumstances, the evidence presented may be so unreliable and contradictory as to require vacation of a conviction on sufficiency grounds.

In **_Karkaria_**, our Supreme Court reversed a conviction for forcible rape, where the evidence, in its entirety, was so unreliable and contradictory that the guilty verdict rendered could not have been based upon anything other than conjecture and surmise. Specifically, in **_Karkaria_**, the defendant, Ian Karkaria, was found guilty of forcibly raping his fourteen-year-old stepsister. This Court affirmed the judgment of sentence, and on appeal to our Supreme Court, Karkaria argued that "the testimony presented to the jury was so unreliable and contradictory that the verdict could only have been arrived at through speculation and conjecture." **_Karkaria_**, **_supra_**, 625 A.2d at 1170.

While our Supreme Court acknowledge in **_Karkaria_** that questions of credibility are to be resolved by the finder of fact and the verdict will not be disturbed if the evidence is credible, the Supreme Court recognized the following:

> This concept, however, must be distinguished from an equally fundamental principle, that a verdict of guilt may not be based upon surmise or conjecture. Following this principle, courts of this jurisdiction have recognized that where evidence offered to support a verdict of guilt is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, a jury may not be permitted to return such a finding.

**_Karkaria_**, **_supra_**, 625 A.2d at 1170 (citations omitted).

Even when viewed in the light most favorable to the Commonwealth, our Supreme Court in **_Karkaria_** determined that the record was "riddled with inconsistencies" and the victim's testimony was "disturbingly vague", casting

- 24 -

"serious doubt upon the jury's ability" to find that the crime of rape occurred during the time alleged. **Karkaria**, **supra**, 625 A.2d at 1171.

For instance, according to the victim, the assaults took place when Karkaria babysat on Friday and Saturday nights, and Karkaria's brother, Andre, was never in the home at that time. **Id.** However, the victim acknowledged that during the six-month period in 1984, Karkaria did not act as a babysitter, and evidence of record showed that Andre was in the home every other weekend, and on alternate weekends. **Id.** The only incident of intercourse of record occurred in 1981, despite the victim's description of numerous rapes. **Id.** Our Supreme Court concluded the evidence presented at trial was based on nothing more than speculation and conjecture, and therefore, was so unreliable and contradictory that it was incapable of supporting a verdict of guilty and was insufficient as a matter of law. **Id.** at 1172.

However, the instant matter is not a case where the trial court, as the finder of fact, rendered a verdict based solely upon vague and contradictory evidence that fails to establish the elements of burglary. While it is evident from the record that portions of Ms. Osorio's trial testimony were inconsistent and contradictory, the trial court found Ms. Osorio's testimony sufficiently reliable from which it could make the relevant findings.

The trial court specifically rejected Appellant's claim and found the instant matter distinguishable from **Karkaria**. In this regard, the trial court indicated:

> Unlike in **Karkaria**, the slight inconsistencies [in the Complainant's trial testimony] identified by defense counsel here pertain to details which are not dispositive of the elements of the offense, and Complainant's testimony was not contradicted by other witnesses or outside evidence separate from her own statements. The trial court determined that any slight inconsistencies in Complainant's testimony were not significant enough, given the passage of time and nature of the incidents, to render Complainant's testimony wholly not credible. The testimony was not so contradictory that the verdict would only have been arrived at through speculation and conjecture, and so this trial court's finding of credibility must stand.

Trial Court Opinion, filed 4/30/21, at 5.

We agree with the trial court's sound analysis. As indicated *supra*, when viewed in the light most favorable to the Commonwealth, as verdict winner, the evidence demonstrates Appellant entered Ms. Osorio's home without her permission and with a contemporaneous intent to commit a crime therein on September 23, 2019.[6] Any inconsistencies in her trial testimony were properly for the finder of fact. **Dailey**, **supra**.

---

[6] Appellant does not dispute the evidence sufficiently demonstrates Ms. Osorio's residence was an occupied structure adapted for overnight accommodations, that Ms. Osorio was present, or that Appellant committed and/or attempted to commit a bodily injury crime while he was inside of Ms. Osorio's residence on September 23, 2019. In any event, the evidence sufficiency establishes these elements. **See** 18 Pa.C.S.A. § 3502(a)(1)(i).

Furthermore, any variance between Ms. Osorio's signed police statements, preliminary hearing testimony, and trial testimony does not require a different conclusion. As noted *supra*, her credibility was for the fact finder to resolve and any question of credibility relates to the weight, not sufficiency, of the evidence. Additionally, the variances do not bring this case within the purview of **Kakaria**. Accordingly, we find Appellant is not entitled to relief on his sufficiency of the evidence claim.

In his final claim, Appellant contends the trial court erred in granting the Commonwealth's pre-trial motion and admitting evidence that Appellant stole Ms. Osorio's son's medication. Appellant contends this "bad act" evidence was unrelated to and/or bore no similarity to either the November 2, 2018, or September 23, 2019, incidents. He specifically avers:

> Admitted at trial over defense objection was proof that when [*sic*] the complainant secured a [PFA] order against [Appellant] weeks after the first incident. It was based in part of [*sic*] his having entered her home on a different occasion *and stolen her son's autism medication*. Proof of that theft—conduct in no way linked to assaultive behavior against the complainant and thus only evidence of bad character and criminal propensity—should have been excluded.
>
> ***
>
> Theft of a child's medication was neither a "striking similarity" nor a "logical connection" to any charge in this case.

Appellant's Brief at 24-25 (italics in original).

Initially, we note that, prior to trial, the Commonwealth filed a motion seeking to introduce evidence of Appellant's prior bad acts, including the PFA order issued against Appellant, as well as the assertions Ms. Osorio made in

her application seeking the PFA order. **See** Commonwealth's Pre-Trial Motion, filed 2/28/20. Relevantly, in the application, Ms. Osorio provided various reasons she was seeking the PFA order, including:

> [Appellant] stole my son's medicine, and he has severe autism and needs his medicine. I called the Police and made a Report[.]
>
> \*\*\*
>
> [The] [p]arties have been together for 9 months. In the past[,] [Appellant] has beat on [complainant] and bruised her body….[Appellant] abuses heroin and Adderall….[Complainant] speculates [Appellant] to have mental health issues.

PFA Form, dated 11/6/18, at 3.

On March 3, 2020, the trial court held a hearing on the motion, and the Commonwealth relevantly averred:

> There was a protection from abuse order that was entered in the temporary form on November 6th and then it became final on November 13th, both of 2018.
>
> The Commonwealth would ask to admit not only evidence of the existence of that PFA, but the reasons enumerated in the PFA for why the Complainant asked for that protection from abuse order[.]

N.T., 3/3/20, at 11.

In response, defense counsel argued the evidence offered by the Commonwealth constituted evidence of prior bad acts and was being used by the Commonwealth solely to show Appellant's "propensity" to commit crime. **Id.** at 14. Defense counsel argued it was prejudicial to make Appellant defend against various crimes for which he was not charged. **Id.** at 15.

- 28 -

The trial court granted the Commonwealth's pre-trial motion to admit evidence of the PFA order, as well as the basis for Ms. Osorio seeking the PFA order. *Id.* Thereafter, as indicated *supra*, the following relevant exchange occurred at trial:

Q. Did you ever seek a protection order against [Appellant]?

A. Yes, I did.

Q. Do you remember when you did that?

A. It was one other time that he broke into my house. He kicked one of the doors opened. I don't—when my son's medicine was stolen, that was like—

[DEFENSE COUNSEL]: Objection.

THE COURT: Sustained. Stricken.

[ADA]: Your Honor, that was part of the prior bad acts motions that was submitted to the Court and was granted. The part of the prior bad acts motions was the PFA itself, and the reasons for which—the reasons for which Ms. Osorio sought the PFA.

[DEFENSE COUNSEL]: I agree that there was a 404B that was granted. That specific allegation, if my memory serves, is not in there. If I'm mistaken about that, I apologize. I don't remember that specific allegation in their 404B motion.

THE COURT: Okay. Give me a moment to look back. Is there anywhere that you can point me to, specifically, in your motion?

[ADA]: Your Honor, I believe that the language that the Commonwealth used was that we were asking to admit the protection from abuse order itself as well as Ms. Osorio's stated reasons for getting that protection from abuse order. And I can say that in the PFA itself, what that incident is, is one that's listed. I don't know that it, specifically, [was] enumerated in the motion.

The language on page 5, in Number 2, the Commonwealth seeks to introduce testimony about the existence of this PFA, and why the complainant filed for the PFA.

THE COURT: I see in my notes that I was allowing for the basis for the PFA as well as the existence of the PFA. So I am going to overrule your objection based on my prior ruling.

[ADA]: Thank you.

*Id.* at 25-26.

Our standard of review for challenges to the admissibility of evidence is well settled:

Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. An abuse of discretion is not merely an error of judgment but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

**Commonwealth v. Tyson**, 119 A.3d 353, 357-58 (Pa.Super. 2015) (*en banc*) (citations and punctuation omitted). Thus, a trial court's decision to admit prior bad acts evidence under the Pennsylvania Rules of Evidence will only be overturned upon a showing of an abuse of discretion. **Commonwealth v. Chmiel**, 585 Pa. 457, 889 A.2d 501, 534 (2005).

Pennsylvania Rule of Evidence 404(b) prohibits the introduction of evidence concerning a defendant's prior bad acts "to prove a [defendant's] character in order to show that on a particular occasion the [defendant] acted in accordance with the character." Pa.R.E. 404(b)(1). However, subsection (b)(2) of the Rule provides that prior bad acts evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation,

plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2).

Another recognized exception under Rule 404(b)(2) is the "complete story" doctrine. Pursuant to this exception, relevant evidence of other offenses may be admitted in order to explain the context or the complete story of the events surrounding the crime in question. **See Commonwealth v. Crispell**, 648 Pa. 464, 193 A.3d 919, 936 (2018). **See also Commonwealth v. Powell**, 598 Pa. 224, 956 A.2d 406, 419 (2008) (holding prior bad acts evidence may be admitted "where the acts were part of a chain or sequence of events that formed the history of the case and were part of its natural development"). However, Rule 404(b)(2) specifies that such evidence "is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2). **See Commonwealth v. Brown**, 52 A.3d 320, 326 (Pa.Super. 2012) ("Where the *res gestae* exception is applicable, the trial court must balance the probative value of such evidence against its prejudicial impact.") (citation omitted)).

In any event, trial courts are not obliged to sanitize a trial by eliminating all unpleasant facts from its consideration when those facts are both relevant and form part of the history and natural development of the events for which the defendant is charged. **Commonwealth v. Page**, 965 A.2d 1212, 1220 (Pa.Super. 2009).

Here, in rejecting Appellant's claim, the trial court relevantly indicated the following:

At trial, [the trial] court clarified that evidence of the PFA [order] and its basis were admissible. Accordingly, Complainant briefly testified to a prior incident in which [Appellant] stole her son's medication. This, along with the November 2, 2018, incident under the [charges at 1160-2019], formed the basis of the PFA [order].

\*\*\*

On the [8265-2019] docket, [Appellant] was charged with Burglary, Stalking, and Contempt for Violation of Order or Agreement. Evidence of the PFA [order] and its basis was properly admitted, as it was relevant and necessary to furnish the complete story and context of the offenses charged. The PFA [order] was clearly relevant to the charge of contempt for violation of an order, as it is the order [Appellant] was charged with violating. It is relevant to the charge of burglary…because violation of the order…[was] evidence of intent to commit a crime upon entry [on September 23, 2019]….[7] Any potentially prejudicial effect was outweighed by the probative value of the evidence, so the admission of the prior bad acts was proper under Rule 404(b).

Trial Court Opinion, filed 4/30/21, at 8-9 (footnote added).

We find no abuse of discretion on the part of the trial court. As it relates specifically to Ms. Osorio's testimony that she secured the PFA order after, *inter alia*, her "son's medicine was stolen," N.T., 10/8/20, at 25, we agree with the trial court that the evidence was admissible under the complete story doctrine. The evidence demonstrated the nature of Appellant's relationship

---

[7] The trial court also suggested it admitted the reasons Ms. Osorio sought the PFA order (*i.e.*, the fact Appellant stole Ms. Osorio's son's medicine) because such evidence was relevant to the charge of stalking as it showed a course of continuous conduct. Trial Court Opinion, filed 4/30/21, at 9.

with Ms. Osorio, who alleged Appellant engaged in a pattern of abuse, taking her property, and destroying her property. We are convinced that, in admitting the evidence for its probative value, the trial court was aware of and attempted to minimize the likelihood that the evidence caused the court to convict Appellant on an improper basis. ***Brown***, ***supra***. ***See Commonwealth v. Gad***, 190 A.3d 600, 605 (Pa.Super. 2018) ("Evidence will not be prohibited merely because it is harmful to the defendant.") (citation omitted)).  Thus, we find Appellant is not entitled to relief on this claim.

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/14/2022